**LEGACY HEALTHCARE, INC.,**
**Appellant (Defendant/Counter–Plaintiff),**

v.

**BARNES & THORNBURG, Appellee (Plaintiff/Counter–Defendant).**

No. 18A02–0408–CV–646.

Court of Appeals of Indiana.

Nov. 28, 2005.

Rehearing Denied Feb. 3, 2006.

Bruce N. Munson, Muncie, IN, Attorney for Appellant.

Forrest Bowman, Jr., Bowman, Cosby & Bowman, Indianapolis, IN, Attorney for Appellee.

## OPINION

SULLIVAN, Judge.

Appellant–Defendant/Counter–Plaintiff, Legacy Healthcare, Inc. ("Legacy"), filed a counter-claim against Appellee–Plaintiff/Counter–Defendant, Barnes & Thornburg ("B&T"), alleging malpractice in B&T's representation of Legacy concerning Legacy's participation in the Medicaid program. Specifically, Legacy alleged that B&T negligently failed to perfect appeals of certain administrative determinations adverse to Legacy. The trial court granted B&T's motion for summary judg-

ment. Legacy now appeals,[1] presenting three issues, which we reorder and restate as whether the trial court erred in granting summary judgment in favor of B&T on Legacy's three claims of malpractice based upon the following three events:

(1) B&T's failure to file the Agency Record in the judicial review of the administrative agency decision to disqualify a certain administrative law judge ("ALJ");

(2) B&T's failure to timely challenge a September 21, 1999 notice from the Indiana State Department of Health ("ISDH") terminating Medicaid certification for Legacy's Community Care Center in North Vernon; and

(3) B&T's failure to challenge a September 2, 1999 notice from the ISDH terminating the Medicaid certification for Legacy's New Horizon Developmental Center ("New Horizon").

We affirm.

The resolution of this case involves the unfortunately convoluted and complex nature of the Medicaid system. Because of this, we first attempt a general overview of this system.[2] As is typical when dealing with governmental agencies, acronyms flourish. A listing of the acronyms frequently used follows:

- ISDH ..... Indiana State Department of Health.
- FSSA ..... Indiana Family and Social Services Administration.
- OMPP ..... Office of Medicaid Policy and Planning, part of the FSSA.
- ICF/MR ..... Intermediate Care Facility for the Mentally Retarded.
- FFP ..... Federal Financial Participation, i.e. federal funds for Medicaid.

Title XIX of the Social Security Act, popularly called "Medicaid," was enacted by the United States Congress in the Social Security Amendments of 1965, Pub.L. No. 89–97. *Sullivan v. Day,* 681 N.E.2d 713, 715 (Ind.1997). The Medicaid statutes create a comprehensive cooperative federal-state program for medical care under which participating states are federally financed for their medical assistance programs if they submit a state plan which comports with federal requirements. 81 C.J.S. *Social Security & Public Welfare* § 247 (2004). Although state participation in Medicaid is voluntary, if a state chooses to participate, it must comply with the federal statutes and regulations governing the program. *Id.*

As explained by the Seventh Circuit Court of Appeals in *Legacy Healthcare, Inc. v. Feldman,* 11 Fed.Appx. 589, 590 (7th Cir.2001),[3] Medicaid service providers

---

1. In 2002, during the proceedings in the trial court, the trustee in bankruptcy for Legacy was substituted as a party. We nevertheless will refer to "Legacy" as the party.

2. We note that the resolution of this case has been hampered by the parties' presentation of the issues. Perhaps because both parties feel intimately acquainted with the rather Byzantine complexity of the Medicaid system, their presentation and explanation of the applicable law was oftentimes confusing at best. Indeed, after lengthy research into the subject, we are left with many unanswered questions. Nevertheless, we have endeavored to address

the issues presented by the parties as best we can. That being said, the following explanation of the Medicaid system is by no means exhaustive but is given to better acquaint and orient the reader with the underlying background of the facts of the present case.

3. We note that the *Feldman* decision was not selected for publication in the Federal Reporter. Pursuant to Seventh Circuit Rule 53, such unpublished orders "shall not be cited or used as precedent" "[e]xcept to support a claim of res judicata, collateral estoppel or law of the case." Nevertheless, the decision contains a rather extensive description of the

operate under a "provider agreement" with the state's "Medicaid Agency." In Indiana, the Medicaid Agency is the FSSA, which operates the Medicaid program through the OMPP. *Id.; see also Sullivan v. Evergreen Healthcare Ltd.,* 678 N.E.2d 129 (Ind.Ct.App.1997). Federal law requires the participating states to designate a "survey agency" to evaluate facilities to determine whether the facilities meet the various requirements for participation in the Medicaid program. *Feldman,* 11 Fed.Appx. at 590 (citing 42 U.S.C. §§ 1396a(a)(9), (33)). In Indiana, the survey agency is the ISDH. *Id.;* Ind. Code § 16–28–12–1 (Burns Code Ed. Repl. 2005). Pursuant to 42 C.F.R. § 442.101, before the OMPP may approve a provider agreement with a facility, it must obtain notice from the ISDH that the facility has met the requirements for certification in the Medicaid program. *Feldman,* 11 Fed. Appx. at 590; *see also* Ind.Code § 12–15–13–0.6 (Burns Code Ed. Repl.2001) (requiring Medicaid providers to be eligible to render service on the date for which the service is billed); 405 Ind. Admin. Code § 1–12–1(a)(1) (payments to ICFs/MR contingent upon "proper and current certification"); 405 Ind. Admin. Code § 1–1–3(e) (Medicaid only liable for the payment of claims filed by providers who were certified at the time the service was rendered).

There are generally two types of requirements for Medicaid certification. The first are referred to as "conditions of participation." *See* 42 C.F.R. § 483.400 through 483.480 (conditions of participation for ICFs/MR). To obtain Medicaid certification, the ISDH *must* find that an ICF/MR facility meets the conditions of participation. *See* 42 C.F.R. § 442.101(d)(1), (e). The second type of requirements are referred to as "standards of participation." According to the court in *Lichtman v. Blom,* 1994 WL 704799 (S.D.N.Y. Dec. 16, 1994),[4] "Conditions of Participation, the more important standard, must be complied with in order to participate in the Medicaid Program. Standards of Participation combine to form a Condition of Participation." *Id.* at *3. *See, e.g.,* 42 C.F.R. § 483.410 (condition of participation regarding governing body and management of ICF/MR contains five component standards of participation); *see also* 42 C.F.R. § 442.101(a)(3) (although facility may be certified as having "standard-level" deficiencies, all "conditions of participation" must be found to be met). The duration of a Medicaid provider agreement generally may not exceed twelve months.[5] 42 C.F.R. § 442.15.

The ISDH may also terminate a facility's certification. *See Feldman,* 11 Fed. Appx. at 590. This is a two-step process: first, the ISDH, as the survey agency, determines that a facility's certification should be terminated when the ISDH finds that the facility's care is deficient and thus

Medicaid system and involved Legacy as a party.

**4.** This case was unreported in the Federal Supplement.

**5.** The OMPP as the Medicaid Agency may extend a provider agreement for a single period of two months if the ISDH gives written notice that the extension will not jeopardize the patients' health and safety and: (1) the extension is needed to prevent irreparable harm to the facility or the Medicaid recipients therein, or (2) the extension is needed because it is impractical to determine before the expiration of the provider agreement whether the facility meets the requirements of certification. *See* 42 C.F.R. § 442.16. Thus, under these limited circumstances, the duration of a provider agreement may be fourteen months. As a parallel requirement, 42 C.F.R. § 442.109 states that the survey agency may certify a facility which fully meets the applicable Medicaid requirements for up to twelve months, with the possibility of the two-month extension mentioned in § 442.16.

not in compliance with Medicaid standards. *Id.* Indeed, 42 C.F.R. § 442.117 provides that the survey agency "*must* terminate a facility's certification if it determines that ... [t]he facility no longer meets the conditions of participation for ICFs/MR ... [or] [t]he facility's deficiencies pose immediate jeopardy to residents' health and safety." (emphasis supplied).

Next, if the ISDH does determine that the facility does not meet the necessary conditions, the OMPP then sends an official notice of "decertification"[6] to the facility based upon the ISDH's determination, which notice terminates the Medicaid provider agreement and Medicaid funding. *Feldman,* 11 Fed.Appx. at 590. "With limited exceptions ... the OMPP cannot provide Medicaid funding to a facility that is not certified to participate in the Medicaid program." *Id.* (citing 42 C.F.R. § 442.12). However, the OMPP is under no obligation to enter into a provider agreement simply because the ISDH has found the facility in question to be certified. *See Ind. State Dep't of Health v. Legacy Healthcare, Inc.,* 752 N.E.2d 185, 191 (Ind.Ct.App.2001).

### Procedural History of Present Case

B&T filed suit against Legacy on April 10, 2001, asserting claims for unpaid legal fees. On September 18, 2001, Legacy filed an answer which admitted that it had incurred charges for legal services, but asserted a counter-claim alleging malpractice on the part of B&T. Eventually, on September 26, 2003, B&T moved for summary judgment with regard to the malpractice claims. Legacy filed its response in opposition to B&T's motion for summary judg-

ment on October 27, 2003. Following a hearing held on January 23, 2004, the trial court, on March 30, 2004, entered an order granting summary judgment to B&T with respect to Legacy's malpractice claims. On July 2, 2004, the trial court entered judgment against Legacy with regard to the remaining issue of unpaid legal fees. Legacy filed its notice of appeal on August 8, 2004.

### Standard of Review

■ The elements of attorney malpractice are: (1) employment of an attorney which creates a duty; (2) the failure of the attorney to exercise ordinary skill and knowledge (the breach of the duty); and (3) that such negligence was the proximate cause (4) of damage to the plaintiff. *Beall v. Mooring Tax Asset Group,* 813 N.E.2d 778, 781 (Ind.Ct.App.2004). Here, neither party disputes that Legacy employed B&T, thus creating the duty, and Legacy admits that it has the burden of proving the elements of legal malpractice. B&T correctly notes that so long as it negatives at least one element of Legacy's malpractice claim, summary judgment would be proper. *See Arnold v. F.J. Hab. Inc.,* 745 N.E.2d 912, 915 (Ind.Ct.App.2001). Indeed, the focus of B&T's argument is that it established prima facie that Legacy cannot prove that B&T's alleged breach of duty caused Legacy any harm.[7]

■ As an appeal from the trial court's grant of summary judgment, our standard of review is well settled. Summary judgment is appropriate only where the designated evidentiary matter shows that there are no genuine issues as to any material

---

6. The relevant statutes and regulations usually refer to the "termination," "cancellation," or when appropriate "non-renewal" of Medicaid certification. The parties and materials before us often use the term "decertification," which we take as equivalent to "termination" or "cancellation" of Medicaid certification.

7. At oral argument, B&T effectively conceded for purposes of summary judgment that its representation in the present case was negligent, abandoning an argument briefly touched upon in its brief that its actions with regard to the September 2, 1999 termination notice were reasonable given the state of the law at that time.

fact and that the moving party is entitled to a judgment as a matter of law. *Rector v. Oliver,* 809 N.E.2d 887, 889 (Ind.Ct.App. 2004) (citing Ind. Trial Rule 56(C)). When reviewing a grant of a motion for summary judgment, we stand in the shoes of the trial court. *Id.* Once the moving party demonstrates, prima facie, that there are no genuine issues of material fact as to any determinative issue, the burden falls upon the non-moving party to come forward with contrary evidence. *Id.* The non-moving party may not rest upon the pleadings but must instead set forth specific facts, using supporting materials contemplated under Trial Rule 56, which show the existence of a genuine issue for trial. *Burgess v. E.L.C. Electric, Inc.,* 825 N.E.2d 1, 5 (Ind.Ct.App.2005), *trans. denied.* The party appealing the grant of summary judgment bears the burden of persuading this court that the trial court erred, but we still carefully scrutinize the entry of summary judgment to ensure that the non-prevailing party was not denied its day in court. *Id.* We do not weigh the evidence but rather consider the facts in the light most favorable to the non-moving party. *Id.* We may sustain the judgment upon any theory supported by the designated evidence. *Rector,* 809 N.E.2d at 889. The trial court here entered specific findings of fact and conclusions thereon. Although such findings and conclusions facilitate appellate review by offering insight into the trial court's reasons for granting summary judgment, they do not alter our standard of review and are not binding upon this court. *Burgess,* 825 N.E.2d at 5.

### *Issue I*

### *Disqualification of ALJ*

On August 30, 1999, the ISDH filed a motion to disqualify ALJ Christen and to set aside his order of August 27, 1999.[8] As a basis for its motion, the ISDH complained that on August 24, 1999, ALJ Christen had personally made an on-site inspection of Legacy's New Horizon facility and interviewed unsworn witnesses and discussed his "thoughts and speculations" about the issue under consideration. Appellant's App. at 237. ALJ Christen issued a recommended order denying the motion to disqualify him. The ISDH appealed this decision to the ISDH Administrative Appeals Panel ("Appeals Panel"), which on January 5, 2000, entered a final order reversing ALJ Christen's decision and finding that his conduct violated certain statutes and gave the appearance of bias, prejudice, and impropriety. ALJ Christen was therefore disqualified from hearings in four pending matters involving Legacy. B&T then filed on behalf of Legacy a petition for judicial review of the Appeals Panel's final order disqualifying ALJ Christen. However, the petition was ultimately dismissed because B&T failed to file the record of the administrative agency within thirty days of the filing of the petition. *See* Ind.Code § 4–21.5–5–13 (Burns Code Ed. Supp.2004); *Indianapolis Yellow Cab, Inc. v. Ind. Civil Rights Comm'n,* 570 N.E.2d 940, 942 (Ind.Ct.App. 1991) (failure to timely file administrative record is a jurisdictional defect which may be raised at any time and to which the parties cannot consent, and a reviewing court may sua sponte dismiss a petition upon such failure). B&T eventually withdrew its appearance on behalf of Legacy, stating that Legacy had secured other representation.

Legacy now claims that B&T's failure to timely file the agency record was malprac-

---

8. Although not explicitly explained by either party, the matter then in question dealt with Legacy's New Horizon facility.

tice. Legacy argues that because of B&T's oversight, "[w]ork became moot, and money became wasted as a result." Appellant's Br. at 28. This apparently refers to both the work done by B&T on the issue up to that point, which Legacy claims totaled $26,246, and work performed by another of Legacy's attorneys who is not affiliated with B&T, William Tedards, whose fees Legacy claims totaled approximately $40,000.

B&T contends that Legacy has waived consideration of this issue for failing to present a cognizable argument. We are inclined to agree. Legacy's entire argument on this point consists of four sentences unadorned by citation to authority. We would be well within our discretion to not consider Legacy's claims as to this issue. *See* Ind. Appellate Rule 46(A)(8)(a). Regardless of waiver, Legacy has not explained how B&T's failure caused it harm. The essence of Legacy's argument is that because of B&T's failure, ALJ Christen did not hear Legacy's case.

■ B&T claims that no party is entitled to a particular judge in any proceeding, citing *Cornett v. Johnson*, 571 N.E.2d 572, 575 (Ind.Ct.App.1991), which held that in determining whether an attorney committed malpractice by failing to present certain evidence at divorce proceeding, proximate cause is analyzed with the objective standard of what a reasonable

judge would have done if the evidence had been presented, not what a particular judge would have done. Although not entirely on point with the current issue, we agree with B&T's general proposition that no party is entitled to any particular judge. *See State ex rel. Knox v. Shelby County Superior Court*, 259 Ind. 554, 557, 290 N.E.2d 57, 59 (1972) (in holding that rule regarding change of venue from judge did not disenfranchise county voters, court cited *Ex Parte N.K. Fairbank Co.*, 194 F. 978, 996 (M.D.Ala.1912) for proposition that "the judge has no right to preside in a particular case nor does the litigant have any right to have a particular judge try his case.").[9]

We are unable to see how Legacy could demonstrate any harm caused by B&T's failure without ultimately having to show that it was entitled to have ALJ Christen hear the pending matters as to which he was disqualified. Given that no party is entitled to a particular judge, Legacy cannot demonstrate any resultant harm stemming from B&T's handling of the disqualification issue. Therefore, the trial court did not err in granting summary judgment in B&T's favor upon this issue.

### Issue II

#### Community Care Center in North Vernon

■ Legacy owns and operates the Community Care Center ("CCC") in North

9. Courts in many other states have come to similar conclusions. *See Moore v. State*, 895 P.2d 507 (Alaska Ct.App.1995) (litigants have no right to insist that a matter be heard by any particular judge); *State v. Fulminante*, 161 Ariz. 237, 778 P.2d 602 (1988) (defendant not entitled as a matter of right to any particular judge), *aff'd* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Rowe v. Moss*, 656 S.W.2d 318 (Mo.Ct.App.1983) (party not entitled to a particular judge); *City of Miami v. Clarke*, 222 So.2d 214 (Fla.Dist.Ct.App. 1969) (defendant not entitled to be tried by a particular judge); *Metro. Water Dist. of S. Cal.*

*v. Adams*, 19 Cal.2d 463, 122 P.2d 257 (1942) (parties had no right to a decision by any particular judge or group of judges); *State ex rel. Armijo v. Lujan*, 45 N.M. 103, 111 P.2d 541 (1941) (no litigant is entitled to have any particular judge try any particular case for him); *State v. Innocenti*, 170 Wash. 286, 16 P.2d 439 (1932) (defendant was not entitled to have his case heard before any particular judge); *State v. Horr*, 163 Minn. 141, 203 N.W. 979 (1925) (defendant was not entitled to have his case tried before any particular judge).

Vernon, Indiana. The ISDH conducted compliance surveys of CCC in March, April, and September of 1999. A survey conducted on September 20, 1999 resulted in a letter from the ISDH on September 21, 1999, which said ISDH found several deficiencies constituting immediate jeopardy to the patients and which recommended that CCC's Medicaid provider agreement be terminated. The deadline to appeal this notice was November 23, but B&T did not file the appeal until November 24. Because of this, the appeal was eventually dismissed as untimely. Legacy claims that B&T's failure to timely file the appeal was negligence which caused harm to Legacy.

B&T notes that appeals were taken from other notices sent during the same survey period which resulted in the September 21 notice. The ALJ who heard the other appeals, ALJ Clark, held hearings from September 27 through October 8, 1999 to determine whether CCC's license to operate a health care facility should be revoked.[10] The hearings covered two consolidated licensure complaints which stemmed from the March and April surveys which found "immediate jeopardy." Appellant's App. at 233. Although the hearings were not a review of the September 21 notice which B&T failed to timely appeal, ALJ Clark did hear evidence regarding the findings of the September 20 survey which ultimately led to the September 21 notice. On January 11, 2000, ALJ Clark issued findings and conclusions recommending that Legacy's license to operate CCC be revoked and that a state-appointed monitor be appointed to protect the residents and facilitate their relocation to other facilities. This order by itself seems not to be directly related to the Medicaid certification issue. Thereafter, on February 14, 2000, ALJ Clark issued a recommended order that CCC should be decertified as a Medicaid provider, incorporating the findings of the January 11 licensure order.

Legacy appealed this decision to the Appeals Panel, which issued a final order on August 7, 2000 upholding ALJ Clark's decision. (A–95–110). In addition to upholding the January 11 and February 14 recommended orders of the ALJ, the Appeals Panel's final order referenced two other recommended orders of the ALJ—one from August 20, 1999 and the other, a September 1, 1999 order which clarified the August order.[11] Regarding the August 20, 1999 recommended order, the Appeals Panel concluded:

"Since it was determined above that immediate jeopardy still existed at the time of the abatement survey, the ALJ had no authority to order continuation of payment for 180–days pursuant to 42 CFR 488.450.[12] While both parties ad-

10. The licensure issues appear to be separate from Medicaid certification, but apparently involved similar concerns regarding patient safety. *See Advantage Home Health Care Inc. v. Ind. State Dep't of Health*, 829 N.E.2d 499, 501 (Ind.2005) (noting that although the ISDH typically conducts one survey, it acts in two distinct capacities when doing so: as a state licensing and regulatory agency, and as an agent for the federal Centers of Medicare and Medicaid Services, i.e. as the survey agency).

11. The final order says that the appealed order before the Appeals Panel was "based on a Petition for Review filed by the [ISDH] to [ALJ] Clark's Recommended Order filed August 20, 1999, and the clarification of the Order filed September 1, 1999; and [Legacy]'s objections to the Notice of Filing of the Recommended Order of Judge Clark's filed on January 11, 2000 and February 14, 2000 pertaining to the above Cause Numbers." Appellee's App. at 95. Neither party cites to an actual copy of the August 20, 1999 recommended order.

12. This section of the C.F.R. refers to "SNFs" and "NFs." SNFs are "skilled nursing facili-

mit that the procedure for appeal of Medicaid decertification is still a matter of debate, *it was clear to the panel that the facility did not meet the requirements set out in the Federal regulations for continued payment.* Thus, the Order was amended to read as follows: 'That the relief request in Cause No. M–167–99 be denied and the Petitioner's Medicaid certification is terminated due to the existence of immediate jeopardy that was not abated during the allotted statutory time for abatement of the jeopardy." Appellee's App. at 97 (emphasis supplied).

The final order further stated that "[s]ince the Recommended Order of September 1, 1999 was a clarification of the August 20, 1999 Recommended Order, the following Final Order was adopted by the Appeals Panel as the September 1, 1999 Order." *Id.* at 101.

B&T now claims that Legacy has established no harm resulting from the failure to properly perfect an appeal of the September 21, 1999 termination notice because the final order affirms the recommended orders which were issued before the September 21 notice. Thus, according to B&T, any appeal of the subsequent September 21, 1999 notice would have ultimately proved futile, because the earlier-issued recommended order terminating CCC's certification was eventually upheld by the Appeals Panel.

We are persuaded by B&T's argument. The Appeals Panel's final order affirmed the ALJ's orders which terminated CCC's certification. These orders were issued before the ISDH issued the September 21 notice which B&T failed to timely appeal. We fail to see how Legacy could have ultimately succeeded on such an appeal,

had one been timely filed, given that the Appeals Panel eventually affirmed the ALJ's orders terminating certification which were issued before September 21, 1999. This establishes prima facie that B&T was entitled to summary judgment upon Legacy's claim regarding the failure to appeal the September 21, 1999 notice. Legacy responds by arguing that if the earlier termination was final, there would have been no reason for the ISDH to pursue the September 21 termination. However, the ISDH could very well have been pursuing the September 21 termination process in the event that the ALJ's August 20 order was overturned upon appeal. Legacy refers us to no other designated evidence which creates a genuine issue of material fact for trial with respect to this issue. Any negligence upon the part of B&T involving the appeal of the September 21 order was harmless given the outcome of the appeal of the earlier orders. The trial court did not err in granting summary judgment to B&T upon Legacy's claims of negligence involving B&T's handling of the appeal of the September 21 termination of CCC's Medicaid certification.

### Issue III

### New Horizon Notice

The issue drawing the primary focus of the parties involves B&T's failure to file an administrative appeal to a letter sent to Legacy on September 2, 1999 which notified Legacy that New Horizon's Medicaid certification was "cancelled" effective September 1, 1999.[13] Appellant's App. at 183. Legacy's President and owner, Douglas Bradburn, had previously informed B&T that Legacy wanted to appeal *"every administrative action filed against [it]."* Appellant's App. at 359 (emphasis in original).

---

ties" and NFs are "Medicaid nursing facilities." 42 C.F.R. § 485.717.

**13.** We will refer to this letter as the "September 2 notice."

Legacy's provider agreement was eventually cancelled. Legacy now claims that the failure to file an appeal from the ISDH's September 2 notice resulted in the cancellation of the provider agreement and the resulting cessation of Medicaid funding.[14] As detailed next, however, the September 2 notice was neither the first nor the last sent to Legacy regarding deficiencies at New Horizon.

### April 8, 1998 Notice

On April 8, 1998, the ISDH gave notice in a letter to Legacy that New Horizon's Medicaid certification was being "cancelled" effective that date. The notice stated that New Horizon's "certification for participation in the Medicaid program as an Intermediate Care Facility for the Mentally Retarded is ordered cancelled effective April 8, 1998." Appellant's App. at 91.[15] B&T timely appealed this decertification notice by filing a petition for review and stay of effectiveness, challenging the authority of the ISDH to cancel Medicaid certification. According to the State Operations Manual,[16] the ISDH was required to

"initiate the action, prepare the necessary documents, and forward them to the State Medicaid agency [i.e., OMPP], which has the responsibility for the termination, non-renewal or cancellation of the [provider] agreement."[17] Appellant's App. at 92. This administrative appeal was given the cause number M–162–98, and ALJ Stanley was eventually appointed to hear the case. In a recommended order issued September 27, 1998, ALJ Stanley vacated the ISDH's order, concluding that the ISDH's role was to make recommendations to the FSSA's OMPP division and that any order terminating Medicaid participation must come from the FSSA.[18] The ISDH objected to the ALJ's findings, and an Appeals Panel was appointed to review the Recommended Order under cause number AP–M–162–98. On June 30, 1999, the Appeals Panel issued a final order which incorporated the ALJ's findings save one,[19] thus agreeing with the ALJ's decision in relevant part. There is no indication that either party sought further review of this final order.

---

14. At oral argument, Legacy's counsel estimated that the monetary damages which resulted from the termination of Legacy's Medicaid funding were in excess of ten million dollars.

15. This quote is actually taken from an "appendix" with a caption from the U.S. District Court for the Southern District of Indiana. It is unclear as to whether this is an appendix to an order by the court or a filing by one of the parties. Neither party refers us to an actual copy of the April 8 notice, but neither party disputes the accuracy of the material quoted in the appendix.

16. The State Operations Manual is an extensive document prepared by the federal Centers for Medicare and Medicaid Services. A copy of the current Manual can be found on the internet at http://www.cms.hhs.gov/manuals/ 107_som/som107 index.asp (last visited November 18, 2005).

17. Again, this is a quote from the "appendix," not directly from the State Operations Manual.

18. This contradicts the description given by the Seventh Circuit in *Feldman, supra,* which indicated that appeals had to be taken from both the ISDH's decertification and the OMPP's termination of the provider agreement. 11 Fed.Appx. at 590–91. It should be noted, however, that *Feldman* was not handed down until 2000, and even then was not selected for publication in the Federal Reporter. *See* note 3, *supra.* As explained *infra,* following a change in the Interagency Agreement between the ISDH and the OMPP, this court specifically held that the ISDH does have authority to terminate a provider's Medicaid certification.

19. The one finding the Appeals Panel did not incorporate was the ALJ's finding that there was no substantial basis to recommend termination.

### July 21, 1999 Notice

A similar course of events occurred beginning on July 21, 1999, when the ISDH sent another notice to Legacy regarding the New Horizon facility. This notice was worded identically to that sent on April 8, 1998, except for changes in dates and the use of the word "terminated" instead of "cancelled."[20] It stated that certification termination was effective as of August 13, 1999. B&T filed a petition for review on behalf of Legacy under cause number M–171–99, and on July 26, 1999, ALJ Christen was appointed to hear the case. On August 23, 1999, ALJ Christen issued a recommended order which found that the Appeals Panel's final order in the previous action, AP–M–162–98, was binding upon the parties and that the ISDH therefore lacked the authority to terminate New Horizon's Medicaid certification. There is no indication that the ISDH further appealed this matter.

### September 2, 1999 Notice

As stated, the main issue upon appeal revolves around B&T's failure to appeal the ISDH's September 2 notice informing Legacy that New Horizon's Medicaid certification had been cancelled. The facts surrounding this notice will therefore be given in detail.

Starting on April 23, 1999, the ISDH began a series of surveys, known as a "survey cycle." Following the initial survey, the ISDH informed Legacy that the New Horizon facility was not in compliance with the conditions of participation of the Medicaid program. Legacy later claimed to be in compliance, and the ISDH therefore conducted a follow-up survey on June 3, 1999. The survey again concluded that New Horizon was not in compliance, and the ISDH sent notice to Legacy stating that if the deficiencies were not corrected,

New Horizon's provider agreement would automatically be cancelled on September 1, 1999.

Eventually, the ISDH sent to Legacy the September 2 notice, via certified mail, which summarized the history of the case thus far and concluded that New Horizon was out of compliance with both the "conditions of participation" and the "standards of participation." Appellant's App. at 183. The letter concluded:

"Notice is hereby given to you, pursuant to I.C. 4–21.5–3–6, that the [ISDH] has made a final determination that your certification for participation in the Medicaid program as an Intermediate Care Facility for the Mentally Retarded *should* be cancelled effective September 1, 1999. This notice will be forwarded to the [OMPP] with a *recommendation* that they [sic] terminate your provider agreement.

Once this order is effective, and your certification is canceled, you may take steps to achieve compliance with the Medicaid requirements and reapply for participation as a provider of services under Title XIX of the Social Security Program." Appellant's App. at 183–84 (emphasis supplied).

Despite the use of the words "should" and "recommendation," the letter also contained a notice of administrative appellate rights. Still, as noted earlier, B&T failed to file an appeal of the September 2 notice. According to the B&T attorney who represented Legacy at the time, Michael Grubbs, he and Mr. Tedards, the non-B&T attorney who also represented Legacy, "decided it would be unnecessary and undesirable to appeal the [September 2] notice from ISDH and that the proper course of action would be to appeal the notice from OMPP that would purport to revoke

---

**20.** *See* note 6, *supra*.

the Medicaid provider agreement."[21] Appellant's App. at 225.

As a result of the September 2 notice, the OMPP eventually sent Legacy notice on September 9, 1999 stating that pursuant to the ISDH's decertification "recommendation" on September 2, New Horizon's provider agreement was terminated as of September 1, 1999. Legacy, still represented by B&T, did file an appeal of the OMPP's September 9 termination notice.[22]

### October 18, 1999 Notice

After the September 2, 1999 notice, the ISDH sent another notice to Legacy on October 18, 1999 regarding New Horizon titled "Final Determination to Terminate Certification." This notice stated that although New Horizon's certification was canceled "effective September 1, 1999, ... [t]he cancellation is currently under appeal."[23] Appellant's App. at 101. The October 18 notice further stated:

" 'On October 15, 1999, a complaint survey ... found, based on W149 [standard of participation 42 CFR § 483.420(d)(1) (Staff Treatment of Clients) ] that immediate jeopardy exists' and that ISDH 'has made a final determination that your certification for participation in the Medicaid program ... *should be* terminated effective November 7, 1999. This notice will be forwarded to [OMPP] with a *recommendation* that they terminate your provider agreement.' "[24] Appellant's App. at 101 (emphasis in original).

The OMPP notified Legacy by letter on October 26, 1999 that based upon the ISDH's October 18 recommendation, New Horizon's "Provider Agreement and participation as an intermediate care facility for the mentally retarded in the Medicaid program be terminated effective with the close of business on November 7, 1999."[25] Appellant's App. at 101. Both the ISDH's letter of October 18 and the OMPP's letter of October 26 contained a notice of administrative appellate rights.

On November 3, 1999, B&T filed on behalf of Legacy a petition for review of the ISDH's "purported 'order' " of October 18. ALJ Christen was appointed on November 12, 1999 to hear the petition, which

---

21. Although Legacy takes issue with Grubbs's characterization of the failure to file an administrative appeal of the September 2 notice as a "decision," the fact remains that the September 2 notice was not challenged by filing an administrative appeal. Whether this is regarded as a breach of the duty owed to Legacy, B&T's argument is that the failure to appeal the notice caused no harm to Legacy. Thus, any question of fact regarding this "decision" is immaterial if B&T has properly negatived the elements of causation and damages in Legacy's malpractice action.

22. On August 21, 2000, an ALJ granted summary judgment in favor of the FSSA in this administrative appeal, concluding that the failure to challenge the September 2 notice waived Legacy's right to appeal the ISDH survey. *See Ind. Family & Soc. Servs. Admin. v. Woodruff*, No. 29A02–0410–CV–876, slip op. at 3–4, 831 N.E.2d 1264 (Ind.Ct.App. July 14, 2005) (memorandum decision). After the

FSSA's ultimate authority approved the ALJ's ruling, Legacy sought judicial review, and the trial court reversed. *Id.*, slip op. at 4–5. Upon appeal, however, a panel of this court held that the trial court erred by going beyond the record and beyond the issues presented to provide affirmative relief that had not been requested. *Id.*, slip op. at 8. The court also held the issue to be moot because Legacy had filed for Chapter 7 bankruptcy and had been liquidated. *Id.*

23. This is a curious statement given that the issue here involves B&T's failure to appeal the September 2, 1999 notice which references the September 1 termination date. It could refer to the appeal Legacy did take from the OMPP's September 9, 1999 notice.

24. This quote too is taken from the federal appendix. *See* note 15, *supra*.

25. *See* note 15, *supra*.

was assigned the cause number M–175–99. On January 6, 2000, ALJ Christen issued a Recommended Order in cause number M–175–99 which had been consolidated with another cause. In the Recommended Order, ALJ Christen concluded:

"That the Jeopardy Recommendation in M–175–98 [sic] is VOID as unsupported by substantial evidence, and contrary to law. Further the Jeopardy Recommendation is void under the ruling of the ISDH appeals panel in M–162–98 and does not constitute an appealable agency order in that it merely recommends action by another agency which issues its own appealable order if it adopts the ISDH recommendation and not the recommendation itself." Appellant's App. at 581.

This decision is similar, if not identical, to that ALJ Christen made regarding the ISDH's July 21, 1999 decertification notice—a decision which this court eventually reversed as discussed *infra*. B&T does not refer to this post-September 2 proceeding at all, and Legacy does not indicate what happened after the ALJ's Recommended Order was issued.

### Discussion

Legacy now claims that the failure to appeal the September 2 notice was malpractice which harmed it. In its motion for summary judgment, B&T argued that the failure to appeal the September 2 notice caused no harm to Legacy, and the trial court accepted this argument. Upon appeal, Legacy claims that the trial court erred in granting summary judgment to B&T upon this issue. In doing so, Legacy argues four reasons why the grant of summary judgment was improper as to the question of the September 2 notice: (1) that had an appeal been filed, no hearing on the merits would ever have occurred; (2) that had an appeal been filed, Medicaid funding to Legacy would have continued during the appellate process; (3) that had an appeal been filed, Legacy could have succeeded upon the merits by proving that the allegations in the September 2 survey report were false or did not justify decertification; and (4) that had an appeal been filed, Legacy could have succeeded upon the merits by proving that it could have "broken the cycle" of surveys. We address each of these contentions in turn.

### Would a Hearing on the Merits Have Occurred?

■ Legacy claims that had B&T challenged the September 2 notice, no hearing on the merits of the notice would have occurred. Legacy supports this claim with the affidavit of its attorney Tedards, who stated that he was "certain" that ALJ Christen would have been appointed to hear any appeal of the September 2 notice. Because ALJ Christen had dismissed previous decertification notices from the ISDH as being beyond the scope of the ISDH's authority, Legacy insists that ALJ Christen would have done the same in the present case. B&T responds by claiming that what a particular judge did in a prior case is not proof that the same judge would have done the same thing in a similar, but different, case.

We need not address the issue of precisely what ALJ Christen would have done had an appeal been taken, for even if he would have been appointed to hear the case and even if he would have concluded as he had in the past that the ISDH had no authority to terminate Legacy's Medicaid certification, such conclusion would be erroneous per the holding of this court in *Indiana State Department of Health v. Legacy Healthcare, Inc.*, 752 N.E.2d 185, 192 (Ind.Ct.App.2001), *trans. denied* ("*Legacy Healthcare I*"), wherein this court explicitly held that ISDH *did* have the au-

thority to terminate Legacy's Medicaid certification.

In *Legacy Healthcare I*, the court recounted that the ISDH performed a certification and licensure survey which eventually resulted in a June 25, 1999 decertification notice setting an automatic cancellation date of September 1, 1999. *Id.* at 187. However, another complaint made to the ISDH about Legacy prompted yet another survey which resulted in another decertification notice being sent on July 21, 1999, setting a certification termination date of August 13, 1999. *Id.* Legacy sought administrative review of this July 21 notice, arguing as it had previously that the ISDH had no authority to terminate Medicaid certification. *Id.* at 187–88. ALJ Christen was appointed to hear the appeal and agreed with Legacy that the ISDH lacked authority to terminate Medicaid certification, referring to the decision in cause number M–162–98 [26] in which the Appeals Panel upheld ALJ Stanley's determination that the ISDH had no authority to terminate Medicaid certification. *Id.* at 188.

After ALJ Christen's decision against it, the ISDH informed Legacy by letter that it was "rescinding" the automatic cancellation date of August 13, 1999. *Id.* The ISDH letter nevertheless stated that the previously-set September 1, 1999 automatic cancellation date remained in effect. *Id.* at 188–89. The *Legacy Healthcare I* court noted that Legacy did not appeal the September 2 notice at issue in the present case. *Id.* at 189. The court also noted that on September 9, 1999, the OMPP notified Legacy that it had accepted the ISDH's recommendation, that Legacy's Medicaid provider agreement had been terminated effective September 1, and that

Legacy, i.e. B&T on Legacy's behalf, did file an administrative appeal of this September 9 OMPP decision to terminate Legacy's provider agreement. *Id.* at 189

Despite the ISDH's letter to Legacy in which the ISDH impliedly acquiesced in the ALJ's decision regarding the July 21, 1999 decertification notice, the ISDH still filed an appeal of the ALJ's decision. *Id.* at 189–90. The Appeals Panel, noting a change in the Interagency Agreement between the ISDH and the FSSA, concluded that the ISDH did have the authority to revoke Legacy's Medicaid certification. *Id.* at 190. Legacy appealed that decision by filing a petition for judicial review with the trial court. *Id.* Upon Legacy's motion for summary judgment, the trial court overturned the Appeals Panel's order and held that the decision in the earlier cause number M–162–98 was *res judicata* and controlled the outcome of the case. *Id.*

Upon the ISDH's appeal, the *Legacy Healthcare I* court reversed the trial court's judgment and held that the prior decision in M–162–98 was not controlling because the Interagency Agreement between the ISDH and FSSA had been amended after the decision in M–162–98. *Id.* at 191. Turning to the merits of the question of whether the ISDH did have authority to terminate or cancel Legacy's Medicaid certification, the court quoted a decision of the Federal District Court for the Southern District of Indiana:

> " '[I]t is apparent that the FSSA has established a two-step process for a healthcare facility to become a Medicaid provider and a two-step process before it loses its status as a provider. Each step is taken in conjunction with, and represents a distinct decision by, a sepa-

**26.** This was the administrative appeal from the April 8, 1998 decertification notice mentioned above.

rate State agency. The first step is for the ISDH (the state's survey agency) to certify that the facility fully meets applicable requirements for participation in Medicaid. *See* 42 C.F.R. § 431.610(e)(1). A corresponding responsibility is for the ISDH to decertify a participating facility when it fails to meet those requirements. Once the certification step is accomplished, the OMPP takes the second step, exercising its discretion to enter a provider agreement with the ISDH-certified facility, which would entitle the facility to reimbursement for services rendered to a Medicaid-eligible patient. Although a certification for eligibility from the ISDH is a necessary condition for a facility to obtain a provider agreement with OMPP, it is not a sufficient one. *See* 42 C.F.R. § 442.12(a). The OMPP is not obligated to enter a provider agreement with a facility merely because it is certified as eligible by the ISDH. *See* 42 C.F.R. § 442.12(d) (if state Medicaid agency can show good cause, it may refuse to execute an agreement with a certified facility). *If, however, the ISDH determines that a facility is no longer meeting the requirements of the Medicaid program and terminates its certification, the OMPP must terminate the provider agreement* and follow the appeals procedure in 42 C.F.R. § 431.153. 42 C.F.R. § 442.117(b).'" *Legacy Healthcare I,* 752 N.E.2d at 191–92 (quoting *Legacy Healthcare, Inc. v. Feldman,* 2000 WL 1428667 at *5–6 (S.D.Ind. Mar.8, 2000), *aff'd* 11 Fed.Appx. 589 (7th Cir.2001)) (emphasis supplied).

The *Legacy Healthcare I* court therefore concluded that there was "no question under federal law that, where appropriate," the ISDH had the authority to decertify ICFs/MR:

"In fact, the [ISDH] *must* terminate a ICF/MR's certification if it determines that such facility no longer meets the conditions of participation set forth in 'subpart I of part 483 of [42 C.F.R. Ch IV]' or if '[t]he facility's deficiencies pose immediate jeopardy to residents' health and safety.' 42 C.F.R. § 442.117(a)(1) and (2) (2000). *Thus, the [ISDH] had the authority under federal law to decertify New Horizon* when it determined both that [New Horizon] was out of compliance with conditions of participation and that the deficiencies at the New Horizon facility posed immediate jeopardy to the residents there." 752 N.E.2d at 192. (emphasis supplied).

The decision in *Legacy Healthcare I* therefore settles the question of whether the ISDH has authority to terminate or cancel Medicaid certification. Thus, even if ALJ Christen had been appointed to hear an appeal of the September 2 notice and had he concluded that the ISDH had no authority to terminate New Horizon's Medicaid certification, such would have been erroneous under the ultimate holding in *Legacy Healthcare I.* We reject Legacy's contention that it had a right to rely upon what would have been an erroneous decision and was therefore somehow harmed by the denial of the opportunity to do so.

*Would Funding Have Continued During the Appeals Process?*

■ Both parties devote much of their briefs addressing the question of whether, had an appeal of the September 2 notice been taken, Medicaid funding of New Horizon would have continued. Legacy claims that, had the appeal been filed, Medicaid funding would have continued until the final decision upon the merits and, even if the final decision was not in Legacy's favor, for an additional thirty days after such an adverse decision. In

support of its argument, Legacy refers to the affidavit of its President, Mr. Bradburn, wherein he states that in past cases in which a decertification notice had been appealed, administrative stays were issued and Medicaid funding continued throughout the appeals process, recounting specific examples in which such continued funding occurred. Legacy claims that this evidence at least establishes a genuine issue of material fact as to whether it could have obtained a stay and continued to receive Medicaid funding if an appeal had been filed in the present case.

■ B&T contends that what happened in the past in a certain case does not guarantee that the same thing would have happened in this particular case. In fact, B&T argues that, given the facts of the present case, funding could not have properly continued. We agree with B&T to the extent that the question of what happened in prior cases is, without more, not necessarily indicative of what would have happened in this case had an appeal been filed. We further conclude that the relevant question is not what *would* in fact have happened had an appeal been filed, but what *should* have happened had an appeal been filed. In other words, if Legacy could somehow show that had an appeal been taken, it would have received continued funding during the pendency, but B&T could show that such continued funding would have been contrary to law, then Legacy would not be able to show that it was harmed by the failure to receive the continued funding. A party may not base a claim of harm upon the loss of an opportunity to receive the benefit of an erroneous decision.

Legacy takes B&T's argument on this issue to be that the Code of Federal Regulations ("C.F.R.") limits the availability or even prohibits continued funding to ICFs/MR once the facility's Medicaid certification has been terminated, even if an appeal has been filed. To be sure, certain portions of the C.F.R. do appear to limit the availability of federal financial participation ("FFP") in payments to ICFs/MR once the facility has been decertified. Specifically, 42 C.F.R. § 442.40—titled "Availability of FFP during appeals for ICFs/MR"—provides that FFP may continue to facilities during appeals but only until the date that the administrative hearing which upholds the termination of certification or 120 days after the effective date of termination, whichever occurs first. *Id.* at § 442.40(d). Such continued FFP is available:

> "only when the Medicaid agency, of its own volition, terminates or does not renew a provider agreement, and only when the survey agency [i.e., the ISDH] certifies that there is no jeopardy to recipient health and safety. When the survey agency certifies that there is jeopardy to recipient health and safety, or when it fails to certify that there is no jeopardy, FFP ends on the effective date of termination...." 42 C.F.R. § 442.40(b).

Legacy argues that Indiana Medicaid statutes and regulations and state Medicaid funding are what is controlling in the present case, not the C.F.R. and its restrictions of FFP. B&T agrees.

As explained by B&T in its brief, Medicaid is a pass-through benefit program under which the federal government reimburses the State for payments made by the State to providers who furnish services to patients. Legacy again argues that because it has received stays and continued funding in the past, this establishes a genuine issue as to whether the same would have happened in the present case. B&T contends instead that "Indiana statutes and regulations ... control the State's

payment of funds to Medicaid service providers ... and prohibit such payment to a provider that loses its certification." Appellee's Br. at 32–33. B&T cites several Indiana statutes and regulations which it claims would have prohibited Legacy from receiving state Medicaid funding even if an appeal of the September 2 notice had been filed.

Indiana Code § 12–15–13–0.6 defines a "clean claim" for Medicaid benefits as meeting several conditions, including that "[t]he provider is eligible to render service on the date for which the service is billed." An administrative regulation similarly states that "Medicaid is only liable for the payment of claims filed by providers who were certified providers at the time the service was rendered...." 405 Ind. Admin. Code § 1–1–3(e). Another provision, 405 Indiana Administrative Code § 1–12–1, in setting forth the procedures for Medicaid payments to ICFs/MR, states that "[a]ll payments referred to within this rule for the provider groups and levels of care are contingent upon the following ... (1) Proper and current certification...." From this, we think it abundantly clear that in order to receive payments for Medicaid services rendered, a provider must have Medicaid certification. Legacy does not dispute this as far as it goes, but

claims that had an appeal been filed and a stay granted, its Medicaid certification would have remained intact. Legacy provides little support for this statement. It does mention Indiana Code § 4–21.5–3–6 (Burns Code Ed. Supp.2005) for the proposition that it could have received an administrative stay under this statute. Subsection 6(e) of this statute states that if a petition for review of certain administrative orders [27] is filed within the time period allowed by statute and a petition for stay of effectiveness of the order is filed, an ALJ shall, as soon as is practicable, conduct a preliminary hearing to determine whether the order should be stayed in whole or in part. The order concerning the stay may be issued even after the challenged administrative order becomes effective. *Id.* B&T does not really claim that a stay cannot be issued during appeals of administrative orders. Thus, the question becomes whether Legacy would properly have received a stay of effectiveness of the September 2 notice had an appeal been filed. Unfortunately, the parties do not guide us to any authority governing the conditions under which an administrative stay can be had.

■ B&T does argue that Legacy was not entitled to a stay in that it could not

---

**27.** The orders mentioned in subsection (a) of I.C. § 4–21.5–3–6 are:

"(1) A safety order under IC 22–8–1–1.
(2) Any order that:
  (A) imposes a sanction on a person or terminates a legal right, duty, privilege, immunity, or other legal interest of a person;
  (B) is not described in section 4 or 5 of this chapter or IC 4–21.5–4; and
  (C) by statute becomes effective without a proceeding under this chapter if there is no request for a review of the order within a specified period after the order is issued or served.
(3) A notice of program reimbursement or equivalent determination or other notice re-

garding a hospital's reimbursement issued by the [OMPP] or by a contractor of the [OMPP] regarding a hospital's year end cost settlement.
(4) A determination of audit findings or an equivalent determination by the [OMPP] or by a contractor of the [OMPP] arising from a Medicaid postpayment or concurrent audit of a hospital's Medicaid claims.
(5) A license revocation under:
  (A) IC 24–4.5–3;
  (B) IC 28–1–29;
  (C) IC 28–7–5;
  (D) IC 28–8–4; or
  (E) IC 28–8–5."
Legacy does not explain under which of these definitions the September 2 notice would fall.

demonstrate irreparable harm, citing *Indiana Family and Social Services Administration v. Legacy Healthcare, Inc.,* 756 N.E.2d 567 (Ind.Ct.App.2001) ("*Legacy Healthcare II*"). In that case, involving Legacy's attempted appeal of the September 9 cancellation of Legacy's provider agreement by the OMPP, this court determined that Legacy had failed to establish the "irreparable harm" required to permit judicial review of a non-final agency action. *Id.* at 571. Without such harm, a trial court has no jurisdiction over nonfinal agency actions. *See id.* The court in *Legacy Healthcare II* rejected Legacy's argument that the termination of its provider agreement established irreparable harm because "mere economic injury is insufficient to establish irreparable harm" and "[t]hreatened business failure is not the sort of irreparable injury against which equity protects." *Id.* The court also rejected the argument that termination of its provider agreement would irreparably harm the "fragile residents of … New Horizon," in that the appointment of a receiver to operate the facility protected the residents. *Id.*

Legacy vociferously complains that the holding in *Legacy Healthcare II* is inapplicable. Legacy argues that the fact that it was not able to prove irreparable harm sufficient to allow judicial review of a non-final agency action does not mean that it could not have obtained an administrative stay in the present case if an appeal had been filed. Again, however, neither party directs us to the standards governing the issuance of administrative stays. The closest we are able to come to resolving this question is found in the standards governing the issuance of a stay upon judicial review of a final agency action. Indiana Code § 4–21.5–5–9 (Burns Code Ed. Repl. 1996) allows for the staying of an agency order upon judicial review, except when the petition for judicial review concerns a matter other than an assessment or determination of tax due or claimed to be due the State, or the law concerning the agency whose order is being reviewed precludes a stay. Specifically:

> "The court may enter an order staying the agency order pending a final determination if:
>
> (1) The court finds that the petition for review and the petition for a stay order show a reasonable probability that the order or determination appealed from is invalid or illegal; and
>
> (2) A bond is filed that is conditioned upon the due prosecution of the proceeding for review and that the petitioner will pay all court costs and abide by the order of the agency if it is not set aside…." I.C. § 4–21.5–5–9(a).

Thus, the statute governing stays of agency orders upon petitions for judicial review makes no requirement of showing "irreparable harm" but instead requires a showing of a reasonable probability that the order is invalid or illegal.

Logic would dictate that the standard governing the issuance of stays by an ALJ upon the administrative appeal of an agency order would be similar, if not identical, to the standard for issuing stays upon judicial review of the same order. This strongly suggests that Legacy would not have been required to show irreparable harm to obtain a stay of the September 2 notice. It would, however, require a showing of a reasonable probability that the September 2 notice was either invalid or illegal. This presents the question of whether, if an appeal had been filed, Legacy would have succeeded in showing that the September 2 notice was improper; if Legacy could not have succeeded upon the merits, we fail to see how it would have been able to establish that there was a reasonable probability that it would have

done so. In other words, if Legacy cannot show that the ISDH erred in terminating its certification, it could not have shown that there was a reasonable probability that what the ISDH did was invalid or illegal.

### Repayment of Medicaid Funds

Before we address the issue of whether Legacy would have succeeded upon the merits of an appeal, we address the question of whether Legacy would have been required to repay any amount it might have received if an appeal of the September 2 notice had been taken, an administrative stay had been granted, and Medicaid funding continued.

B&T argues that both the Indiana Code and Indiana Administrative Code provide for the FSSA to be reimbursed for "overpayments." *See, e.g.,* Ind.Code § 12–15–13–3 (Burns Code Ed. Repl.2001) (authorizing the State to seek reimbursement for "overpayment" to a provider). 405 Ind. Admin. Code § 1–1.5–5 provides:

"(a) The [OMPP] may require the repayment of *any amount determined by the [OMPP] to have been paid to the provider in error,* prior to an evidentiary hearing or summary review, unless an appeal is pending and the provider has elected not to repay an alleged overpayment pursuant to 405 IAC 1–1–5(d)(3). The [OMPP] may, in its discretion, recoup any overpayment to the provider by the following means:

(1) Offset the amount of the overpayment against current Medicaid payments to a provider.

(2) In the case of an institutional provider, offset the amount of the overpayment to any or all of the Medicaid facilities owned by the provider until the overpayment has been satisfied.

(3) Require that the provider satisfy the overpayment by refunding the entire amount of the overpayment to the [OMPP] directly.

(4) Enter into an agreement with the provider in accordance with 405 IAC 1–1–5.

(b) Interest from the date of the overpayment will be assessed even if the provider repays the overpayment to the [OMPP] within thirty (30) days after receipt of the notice of the overpayment. This subsection applies to any of the methods of recoupment set out in this section. Interest on overpayments shall not exceed the percentage set out in IC 12–15–13–3(f)(1).

(c) Notwithstanding any other rule in this article, for hospitals who receive a notice that the provider has been underpaid by the [OMPP] as a result of the cost settlement process, the [OMPP] will pay interest to the hospital on the amount of the underpayment. Such interest will accrue from the date of the underpayment at the rate of interest set out in IC 12–15–13–3(f)(2)." (emphasis supplied).

Legacy does not specifically deny that the State may seek to be reimbursed for "overpayment," but contends that the money it might have received during the pendency of an appeal, had one been taken, would not be "overpayment." We note, however, that 405 I.A.C. § 1–1.5–5 states that the OMPP may require repayment of "any amount determined … to have been paid to the provider in error." We think it reasonable that this would include funds paid to Legacy during the appeals process if Legacy failed to succeed upon the merits, i.e., if it was determined that Legacy indeed should have had its Medicaid certification terminated as of September 1, 1999. If Legacy should have had its certification terminated as of that date, then any Medicaid funds it would

have received would not have been proper. *See* I.C. § 12–15–13–0.6; 405 I.A.C. § 1–12–1.

Thus, if the Medicaid funding that Legacy might have received had an appeal been taken would have to have been paid back, Legacy cannot show that the failure to appeal the September 2 notice caused it any harm unless it can also be shown that Legacy would indeed have succeeded upon the merits of an appeal—a question addressed *infra*.

### Breaking the Cycle

Legacy claims that the trial court ignored evidence that it could have "broken the cycle" of a survey. By this, Legacy means "showing that alleged deficiencies have been remedied or refuted, so that the allegations upon which an action was predicated no longer exist." Appellant's Br. at 22. In support of its argument, Legacy refers to Bradburn's affidavit, explaining that in a prior case involving the CCC facility in North Vernon, B&T successfully argued that the cycle had been broken. As best we can discern this argument, it is interrelated with the question of whether Legacy could have ultimately succeeded upon the merits had an appeal been taken.[28]

### Would Legacy Have Succeeded Upon the Merits?

We now come to the key issue before us, that is, whether, had an appeal of the September 2 notice been filed, Legacy would have succeeded upon the merits. By success upon the merits, we mean Legacy demonstrating that the termination of its Medicaid certification was improper. Generally, B&T argues that it established that the termination of Legacy's certification was proper, and that Legacy failed to establish a genuine issue of material fact with evidence to the contrary. Legacy generally argues that B&T never met its burden as the moving party to establish prima facie that it was entitled to summary judgment, and that even if B&T did meet its burden, Legacy's designated materials establish a genuine issue of fact for trial.

In support of its motion for summary judgment on this issue, B&T designated the affidavits of attorney Grubbs, Exhibit S–4, which is Legacy's response to B&T's interrogatories, and the ISDH Survey Report of September 2, 1999 (the "Survey Report").[29]

---

**28.** In its reply brief, Legacy argues that it could have succeeded upon the merits by breaking the cycle through a showing of "substantial compliance," an argument we address below.

**29.** Legacy briefly claims that a "declaration" by Grubbs mentioned in a brief prepared by B&T for Legacy during a federal lawsuit creates a genuine issue of material fact with regard to whether Legacy could have succeed upon the merits of an appeal. Legacy is referring to a reply brief filed in support of its verified motion for a preliminary injunction which was prepared and signed by Grubbs. The brief contains the following passage:

"As Mr. Grubbs narrates in his declaration, the very survey on which the defendants premised this termination has been the subject of extended hearings, resulting in a

refutation of the [State]'s findings. There is no basis for the [State]'s brief to conclude that New Horizon has decertification-level deficiencies." Appellant's App. at 86.

Legacy claims that it requested a copy of Grubbs's declaration referenced in the brief filed in federal court but that B&T's response suggests that "no such document exists, or existed." Appellant's Br. at 23. The pages of the appendix cited by Legacy in support of its argument, however, are part of Legacy's designation of evidence, which in turn refer to B&T's answers to Legacy's interrogatories. Legacy does not refer us to an actual copy of Legacy's interrogatory responses. We will not scour the record in search of evidence in support Legacy's claims. *See Nobles v. Cartwright*, 659 N.E.2d 1064, 1070 (Ind.Ct.App. 1995) (appellate courts are not required to search the record in an effort to discern

With reference to the Survey Report, Legacy claims that it is not evidence and "can no more be used to substitute for evidence in a summary judgment action than a charging information could be used to substitute for evidence in a criminal case." Appellant's Br. at 24.[30] B&T claims that the Survey Report was admissible evidence pursuant to Indiana Evidence Rule 803(8), which sets forth the "public records and reports" exception to the general prohibition against the admission of hearsay evidence found in Evidence Rule 802. In its reply brief Legacy points out that Evidence Rule 803(8) does not except investigative reports by or for an agency when offered by it in a case in which it is a party. We would observe that the ISDH is not a party to the litigation between Legacy and B&T.

■■■ We observe that Legacy admits it did not seek to strike the Survey Report at the trial court level based upon grounds that it was inadmissible as hearsay. By failing to challenge the admissibility of the Survey Report before the trial court, Legacy has waived any claim regarding the admissibility of such upon appeal. *See Bankmark of Fla., Inc. v. Star Fin. Card Servs., Inc.*, 679 N.E.2d 973, 980 (Ind.Ct. App.1997) (observing that a party's failure to file motion to strike or otherwise object to designated evidence on a specific ground results in waiver of the issue upon appeal).[31]

■■■ As to Legacy's argument that the Survey Report is nothing more than a compilation of allegations, we draw from our Supreme Court's opinion in *Advantage Home Health Care, supra.* There our Supreme Court described ISDH survey reports as follows:

"Once the inspection is complete, the investigator produces two survey reports, one report addressing compliance with state law and the other compliance with federal law. The two reports each set forth various 'findings' that are essentially statements made by the investigator as a result of her inspection. The 'findings' are based upon information collected during the inspection from interviews, the review of records and

---

whether genuine issues of material fact exist). Legacy has not shown that there were any "extended hearings" or that the ISDH findings were in fact refuted as claimed in the brief filed in federal court; indeed the very essence of Legacy's current claim is that B&T's negligence deprived it of the opportunity to have such hearings. To the extent that Legacy argues that the brief, or declaration referred to therein, suggest otherwise, it refers us to nothing else in the record to support its position. Legacy may not successfully oppose summary judgment with a reference to a non-existent document. In this regard, Legacy makes no separate claim of spoliation of evidence.

**30.** Legacy in this respect cites, in its initial brief, to an opinion by this court in *Advantage Home Health Care, Inc. v. Indiana State Department of Health*, 792 N.E.2d 914 (Ind.Ct. App.2003). Although that decision stated that "a written [survey] report set[s] forth various

findings," 792 N.E.2d at 915, Legacy seizes upon a subsequent statement in the opinion that the survey report "constitutes the result that is *reflective* of the investigation's findings." 792 N.E.2d at 918 (emphasis supplied). The implication is that Legacy viewed the report as not containing findings as to various failures or deficiencies, but rather as being merely reflective of findings.

Be that as it may, prior to the filing of Legacy's brief, our Supreme Court on May 7, 2004, vacated the Court of Appeals decision and in its opinion upon transfer recited that survey reports contain findings. *Advantage Home Health Care, Inc. v. Ind. State Dep't of Health*, 829 N.E.2d 499, 501 (Ind 2005). On August 10, 2005, Legacy, in a submission of additional authority, acknowledged the grant of transfer.

**31.** We reject Legacy's claim that waiver notwithstanding, consideration of the Survey Report amounts to "fundamental error."

observations of the treatment provided by the agency." 829 N.E.2d at 501.

We consider such "findings" to be more than mere allegations akin to a charging information. They are administrative findings, albeit preliminary ones. As such, we see no reason why the trial court could not consider the Survey Report designated by B&T as evidence for summary judgment purposes.

In any event, Legacy appears to have shifted its appellate focus from whether or not the Survey Report was admissible as evidence in the summary judgment proceeding to a position that concerns the "trial within a trial" that is invariably involved in a legal malpractice case. In this regard, Legacy posits what would have occurred at an administrative hearing, had it been held, with respect to the deficiencies set forth in the Survey Report. More specifically, Legacy argues that its evidence as to the accuracy or validity of the deficiencies found would have been admissible in an administrative hearing. Accordingly, Legacy asserts that it would have been able to refute the findings and conclusions which led to the decertification had B&T appealed the September 2 notice.

As the "trial within a trial" in the present malpractice action would have been an administrative hearing, Legacy posits that the proper question is not whether the proffered designated evidence would have been admissible in a trial, but whether such would have been admissible at an administrative hearing. Legacy cites Indiana Code § 4–21.5–3–26 (Burns Code Ed. Repl.1996) in support of its argument. Pursuant to this statute, an ALJ "may admit hearsay evidence," and if not objected to, such hearsay may form the basis for an order, but if objected to and not admissible through an exception to the hearsay rule, the resulting order may not be solely based upon the hearsay evidence. Legacy's own argument in this regard would therefore seem to suggest that an ALJ may consider the "findings" of a survey report whether hearsay or not but that a reviewing trial court could not do so. To the extent that this is Legacy's position, we reject it insofar as it questions the propriety of the Survey Report being before the trial court for summary judgment purposes.

Turning to the other evidence designated by B&T, the designated portions of Grubbs's affidavits establish that the New Horizon facility had been certified, even though it did not meet all of the standards of participation, with an automatic cancellation date of September 1, 1999. To be sure, the C.F.R. allows for an ICF/MR to be certified under certain circumstances even though it does not meet the standards of participation.[32] 42 C.F.R. § 442.105. Facilities with such deficiencies may be certified pursuant to 42 C.F.R. § 442.110, which states:

32. Among the conditions required to certify a facility which does not meet the standards for ICFs/MR are a determination by the ISDH that deficiencies do not jeopardize patient health and safety; that the ISDH approve the facility's written plan for correction of the deficiencies; that, if the facility was previously certified with a deficiency and has a different deficiency at the next survey, the ISDH determines that the facility was unable to stay in compliance with the standards for reasons beyond its control and is making the best use of its resources to furnish adequate care; that if the facility was previously certified with a deficiency and has the same deficiency at the next survey, the ISDH determines that the facility did achieve compliance at some point during the prior certification period and made a good-faith effort to stay in compliance, but became out of compliance due to reasons beyond its control. 42 C.F.R. § 442.105.

"(a) Facilities with deficiencies may be certified under § 442.105 for the period specified in either paragraph (b) or (c) of this section.

(b) The survey agency may certify a facility for a period that ends no later than 60 days after the last day specified in the plan for correcting deficiencies. The certification period must not exceed 12 months, including the period allowed for corrections.

(c) The survey agency may certify a facility for up to 12 months with a condition that the certification will be automatically canceled on a specified date within the certification period unless—

    (1) The survey agency finds that all deficiencies have been satisfactorily corrected; or

    (2) The survey agency finds and notifies the Medicaid agency that the facility has made substantial progress in correcting the deficiencies and has a new plan for correction that is acceptable.

The automatic cancellation date must be no later than 60 days after the last day specified in the plan for correction of deficiencies under § 442.105."

Thus, New Horizon was certified with an automatic cancellation date of September 1, 1999 pursuant to paragraph (c) of § 442.110. Come that date, certification would be automatically cancelled unless the ISDH found that *all* deficiencies had been corrected or that "substantial progress" was being made toward correcting remaining deficiencies.

B&T argues that because the ISDH made no "substantial progress" finding, the only way for Legacy to have prevailed would have been to show that all deficiencies had been satisfactorily corrected. While we agree that Legacy could have

prevailed by showing that the ISDH erred by not making a finding that all deficiencies had been satisfactorily corrected, Legacy could also have prevailed by showing that the ISDH erred by not making a finding of "substantial progress." Legacy focuses its argument upon its claim that it would not have to be shown that all deficiencies had been corrected, so long as it could establish "substantial compliance." 42 C.F.R. § 488.301 defines "substantial compliance" as "a level of compliance with the requirements of participation such that any identified deficiencies pose no greater risk to resident health or safety than the potential for causing minimal harm." Legacy claims that because a provider can be deemed in "substantial compliance" with the Medicaid requirements, it would not have to prove that it was "perfect," i.e., show that all deficiencies had been corrected, in order to maintain certification for New Horizon.

We do not read the C.F.R. as requiring perfect compliance at all times. Indeed, as noted, a facility may be certified even if it has standard-of-compliance type deficiencies. Such a facility may be certified, but such certification is "conditional," with an automatic cancellation date unless it is found that all deficiencies have been corrected (or it is found that the facility is making substantial progress toward such correction). Legacy provides no authority for the proposition that the provisions for substantial compliance override 42 C.F.R. § 442.110(c)(1)'s requirements that all deficiencies be corrected. The term "substantial compliance" is used in several places throughout Title 42 of the C.F.R. If substantial compliance were enough under section 442.110(c)(1), then that term would have been included in the text of that provision.[33]

**33.** To the extent that requiring *all* deficiencies, however minor, be corrected might seem

We turn then to the question of whether B&T's designated evidence established prima facie that Legacy could not show that the ISDH should have found that all of Legacy's deficiencies had been corrected. B&T argues that Legacy's responses to interrogatories during discovery act as uncontradicted evidence, if not effective admissions, that several deficiencies existed at New Horizon. Thus, B&T argues that Legacy cannot show that it would have maintained its certification after the automatic cancellation date of September 1, 1999, and cannot show that it could have succeeded upon the merits of an appeal had one been taken.

The ISDH Survey Report is a sixty-two page document which details many deficiencies at New Horizon, including violations of both standards of participation and conditions of participation. Grubbs's affidavits state, and Legacy does not deny, that New Horizon was certified with an automatic cancellation date. B&T also designated and relied upon the document referred to as Exhibit S–4, entitled "Why the September 2, 1999 Survey was Invalid." Appellant's App. at 582. This exhibit was Legacy's response to B&T's interrogatory request that Legacy set forth all facts known to Legacy that support its contention that a timely appeal of the September 2 notice would have resulted in Legacy avoiding the cancellation of New Horizon's certification and explain which of the Survey Report's deficiency findings were false and which ones it claimed did not rise to the level of a condition of participation. B&T claims that this response did not challenge the validity of several of the deficiency findings contained in the Survey Report.

Among these deficiencies are instances in which two patients wore soiled clothing, an incontinent patient wet herself and went unnoticed until the surveyor brought it to the attention of staff members, a patient had reddened buttocks and dried feces on her back, a patient had flies crawling on her face and arms, patients wandered around without being redirected, and a patient pulled the hair out of another patient's head. Also observed were a patient putting her hands down her pants without being corrected or being told to wash her hands, a patient putting his hands, shirt, and sheets in his mouth, a patient striking himself without staff using methods required by the patient's treatment plan, and a patient pacing a room, standing against the wall, and pulling out another patient's hair without being given any activities to do by the staff.

B&T claims these instances, and the other deficiencies listed in its brief, are proof that "all deficiencies" were not corrected and that Legacy therefore could not have maintained its certification even if an appeal had been taken. We agree that these allegations establish prima facie that Legacy could not have prevailed upon appeal had an appeal been taken, because all deficiencies had not been corrected. *See* 42 C.F.R. § 442.110(c)(1).

■ This posture of the case shifted the burden to Legacy to designate evidence which would establish a genuine is-

---

harsh, we would observe that a finding of "substantial progress" under section 442.110(c)(2) can be made. Legacy makes no cognizable argument with regard to this provision. We also observe that "substantial compliance" would not be equivalent to "substantial progress." The former term refers to deficiencies which pose minimal harm to patient health and safety, whereas the latter term refers to the actions being taken by a facility to cure deficiencies. We would imagine that substantial progress could be made toward deficiencies which themselves might not fit within the definition of substantial compliance.

sue of fact for trial. Legacy relies upon two exhibits, designated S–2 and S–4, which it claims establishes a genuine issue of fact. Exhibit S–2, however, was stricken by the trial court.[34] In its appellant's brief, Legacy provides no reasons why the trial court's decision was wrong. In its reply brief, Legacy argues in one sentence that despite B&T's argument that Exhibit S–2 was inadmissible, "a characterization of statements as conclusory does not render the affidavit inadmissible." Appellant's Reply Br. at 29 (citing *Anderson v. Yorktown Classroom Teachers Assn.*, 677 N.E.2d 540, 543 (Ind.Ct.App.1997)). Of course we agree that it takes more than a characterization of an affidavit to deem it to be conclusory and inadmissible. In *Anderson*, the court noted the requirement that affidavits supporting or opposing motions for summary judgment must be made upon the affiant's personal knowledge and must show that the affiant is competent to testify upon the matter. *Id.* (citing Ind. Trial Rule 56(E)). The court then concluded that the affidavits in question did not contain improper legal conclusions by referring to an earlier Court of Appeals opinion. *Id.* Here, Legacy makes no cognizable argument as to why the trial court erred in striking Exhibit S–2.

Indeed, the portion of Exhibit S–2 referred to by Legacy upon appeal makes the statement, "This alleged deficiency is not warranted and this facility [New Horizon] is in compliance with the applicable rules and regulations." Appellant's App. at 375. Although Legacy claims that this statement applies to each and every "alle-gation" contained in the Survey Report, to the extent that it attempts to refute the Survey Report's findings, it is baldly conclusory. The same is true of another statement in Bradburn's affidavit cited by Legacy, "[Exhibit S–2] demonstrates that the survey allegations were not supported by substantial evidence and that we were in substantial compliance. . . ." Appellant's App. at 365. This is by definition a conclusion and may not properly support or oppose a motion for summary judgment. *See Anderson*, 677 N.E.2d at 543. Thus, to the extent that Legacy argues that the trial court erred in excluding Exhibit S–2, we are unable to agree.[35]

The remaining evidence relied upon by Legacy is a document referred to as Exhibit S–4. This exhibit was designated by B&T to support its position that Legacy has failed to challenge all the deficiencies found in the Survey Report. Legacy does not argue that the incidents set forth in the Survey Report did not occur, nor does it claim that it designated evidence challenging these individual findings. Legacy claims simply that Exhibit S–4 provides numerous examples of "errors, inaccuracies and mistakes." Appellant's Reply Br. at 30. Its main argument, however, is that the Survey Report is not evidence, a contention we have rejected above. Based upon this, we conclude that Legacy has not contradicted or challenged each deficiency in the Survey Report. In other words, Legacy has failed to demonstrate a genuine issue of fact as to several of the deficiencies contained in the Survey Report.

---

**34.** We are also unable to find any reference to an "Exhibit S–2" in Legacy's designation of evidence submitted to the trial court, nor does B&T's designation contain a reference to a document so titled. Nonetheless, an "Exhibit S–2" is contained in the Appellant's Appendix.

**35.** Legacy refers to no other specific portions of Exhibit S–2. We will not scour the record to find evidence in support of Legacy's claims. *See Nobles,* 659 N.E.2d at 1070.

Because all deficiencies were not corrected, New Horizon's certification was, and if an appeal had been taken would still have been, automatically terminated as of the automatic cancellation date of September 1, 1999. Legacy has failed to demonstrate a genuine issue of material fact as to the question of whether it would have ultimately succeeded upon the merits of an appeal of the September 2 notice.[36]

Because Legacy has failed to prove that it could have succeeded upon the merits of an appeal of the September 2 notice, any continued funding it might have continued to receive during the pendency of such an appeal would have had to have been paid back to the State. We therefore conclude that Legacy has failed to show that any negligence on the part of B&T in failing to appeal the September 2 notice caused any harm to Legacy. The trial court did not err in granting summary judgment in favor of B&T upon this issue.

*Conclusion*

Legacy has failed to demonstrate upon appeal that the trial court erred in granting summary judgment upon its claims of malpractice against B&T in that there is no genuine issue of material fact as to whether B&T's alleged negligence caused Legacy harm.

The judgment of the trial court is affirmed.

NAJAM, J., and RILEY, J., concur.

---

**36.** Legacy claims that because ALJ Christen reversed the ISDH's termination notice of October 18, 1999, he could have done the same thing as to the September 2 notice, which Legacy claims contained less serious allega- tions. Whether or not Legacy successfully challenged the October 18 notice, the fact remains that it has failed to establish a genuine issue of fact as to the success of the September 2 notice.