Randall L. **WOODRUFF, Trustee, U.S. Bankruptcy Court, on behalf of Legacy Healthcare, Inc. d/b/a New Horizon Developmental Center, Appellant–Plaintiff,**

v.

**INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION, Office of Medicaid Policy and Planning, Appellee–Defendant.**

No. 29A02–1002–PL–220.

Court of Appeals of Indiana.

April 11, 2011.

See also 837 N.E.2d 619.

Bruce N. Munson, Muncie, IN, William P. Tedards, Jr., Washington, D.C., Attorneys for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Frances Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Because of conditions at the facility, the Indiana Family and Social Services Administration, Office of Medicaid Policy and Planning, terminated its provider agreement with Legacy Healthcare, Inc., d/b/a New Horizon Developmental Center, which cared for some of the most severely and profoundly mentally retarded and developmentally disabled patients in Indiana, all of whom relied on Medicaid. For the next nine months, however, the Medicaid patients remained at New Horizon with New Horizon paying for their care and services until a receiver was appointed and the residents were finally transferred.

We conclude that once a provider agreement with a long-term care facility such as New Horizon has been voluntarily or involuntarily terminated, FSSA, as the State Medicaid Agency, has the primary responsibility for relocating the Medicaid patients and for ensuring their safe and orderly transfer from the old facility. In addition, FSSA is responsible for the care and services provided to the Medicaid patients during the transfer process. Because New Horizon paid these costs instead of FSSA, New Horizon is entitled to summary judgment on its nearly $4 million quantum meruit claim. We therefore reverse and remand this case.

## Facts and Procedural History

This is the fifth time that an appeal arising out of this litigation has reached our Court.[1] Legacy Healthcare, Inc., owned and operated New Horizon Developmental Center, an intermediate care facility for the mentally retarded (ICF/MR),[2] in Arcadia, Indiana, from November 1, 1993, to November 6, 2000.[3] New Horizon's president was Douglas A. Bradburn. The New Horizon residents were severely and profoundly mentally retarded, developmentally disabled, required extensive medical care, and were not able to function in society. Some were dangerous to themselves and others and required extensive expert supervision in a facility such as New Horizon, which was one of a limited number of ICF/MRs in Indiana at the time. Because all of the New Horizon residents received Medicaid funding, we highlight some of the key Medicaid provisions to help understand the complexities of this case.

The federal Medicaid statutes create a comprehensive and cooperative federal-state program for medical care under which participating states are federally financed for their medical assistance programs if they submit a state plan which comports with federal requirements. *Legacy Healthcare, Inc. v. Barnes & Thornburg*, 837 N.E.2d 619, 622 (Ind.Ct.App. 2005), *reh'g denied, trans. denied.* Although state participation in Medicaid is voluntary, if a state chooses to participate, it must comply with the federal statutes and regulations governing the program. *Id.*

Medicaid service providers operate under a "provider agreement" with the state's "Medicaid Agency." *Id.* at 622–23. In Indiana, the Medicaid Agency is the Indiana Family and Social Services Administration (FSSA), which operates the Medicaid program through the Office of Medicaid Policy and Planning (OMPP).[4] *Id.* at 623. Federal law requires the participat-

---

1. *Legacy Healthcare, Inc. v. Barnes & Thornburg*, 837 N.E.2d 619 (Ind.Ct.App.2005), *reh'g denied, trans. denied; Ind. Family & Soc. Servs. Admin. v. Woodruff*, No. 29A02–0410–CV–876, 831 N.E.2d 1264 (Ind.Ct.App. July 14, 2005); *Ind. Family & Soc. Servs. Admin. v. Legacy Healthcare, Inc.*, 756 N.E.2d 567 (Ind.Ct.App.2001); *Ind. State Dep't of Health v. Legacy Healthcare, Inc.*, 752 N.E.2d 185 (Ind.Ct.App.2001), *reh'g denied, trans. denied.* There was another lawsuit filed in federal court, *Legacy Healthcare, Inc. v. Feldman*, No. IP 00–0306–CM/S, 2000 WL 1428667 (S.D.Ind. Mar. 8, 2000).

2. According to federal law, an ICF/MR is an institution for the mentally retarded or persons with related conditions if "the primary purpose of such institution (or distinct part thereof) is to provide health or rehabilitative services for mentally retarded individuals and the institution meets such standards as may be prescribed by the Secretary" and "the mentally retarded individual with respect to whom a request for payment is made under a plan approved under this subchapter is receiving active treatment under such a program." 42 U.S.C. § 1396d(d).

According to state law, an "Intermediate care facility for the mentally retarded (or persons with related conditions)" is:

a health facility that provides active treatment for each developmentally disabled resident. In addition, the facility provides nursing care, room, food, laundry, administration of medications, modified diets, and treatments. A facility is only for developmentally disabled residents, and the facility shall be designed to enhance the development of these individuals, to maximize achievement through an interdisciplinary approach based on development principles and to create the least restrictive environment.

410 Ind. Admin. Code 16.2–1.1–33.

3. Although Legacy owned and operated New Horizon, we use New Horizon throughout this opinion for the sake of clarity and consistency.

4. We use FSSA and OMPP interchangeably throughout this opinion.

ing states to designate a "survey agency" to evaluate facilities to determine whether the facilities meet the various requirements for participation in the Medicaid program. *Id.* In Indiana, the survey agency is the Indiana State Department of Health (ISDH). *Id.* Before OMPP may approve a provider agreement with a facility, it must obtain notice from ISDH that the facility has met the requirements for certification in the Medicaid program. *Id.*

In addition, the Bureau of Developmental Disabilities Services (BDDS), which is part of FSSA's Division of Disability & Rehabilitative Services, provides services to individuals with developmental disabilities. Specifically, BDDS acts as a screening agency to determine whether an individual has a developmental disability. Ind. Code § 12–11–2.1–1. The agency then develops individual service plans for individuals, *id.* § 12–11–2.1–3, and "shall serve as the placement authority for individuals with a developmental disability ... including all placements in ... an intermediate care facility" such as New Horizon, *id.* § 12–11–2.1–4. The Indiana Administrative Code also provides several guidelines for admission and readmission to an ICF/MR, which are based upon BDDS's determination of the need for such care and includes a review to ensure that the facility can meet the needs of the patient. *See* 405 Ind. Admin. Code 5–13–7; *see also Part-*

*low v. Ind. Family & Soc. Servs. Admin.,* 717 N.E.2d 1212, 1216–17 (Ind.Ct.App. 1999) (FSSA is charged with making ICF/MR eligibility determinations, and an individual is eligible if he or she is mentally retarded and needs active treatment).

From October 31, 1993, to September 1, 1999, New Horizon was certified and licensed by ISDH as an ICF/MR. New Horizon then entered into a provider agreement with FSSA so that it could receive funds to operate its facility.

On September 2, 1999, ISDH notified New Horizon that it had conducted a survey and found that it did not meet program standards; therefore, New Horizon's Medicaid certification would be canceled effective September 1, 1999. Because New Horizon never filed an administrative appeal of ISDH's determination, New Horizon was decertified as a Medicaid provider on September 1, 1999.[5]

ISDH then recommended to FSSA that, given ISDH's decertification of New Horizon, FSSA should terminate its provider agreement with New Horizon. On September 9, 1999, FSSA notified New Horizon that its Medicaid provider agreement was terminated effective September 1, 1999. The notification also stated that provider payments could continue only for up to 30 days from the date of termination

---

5. In one of the previous appeals, New Horizon alleged that Barnes & Thornburg, its attorney, committed legal malpractice for failing to challenge the September 2, 1999, notice from ISDH terminating its Medicaid certification. *See Barnes & Thornburg,* 837 N.E.2d at 632. In that opinion, we noted that the ISDH Survey Report was a sixty-two page document which detailed many deficiencies at New Horizon. *Id.* at 643. "Among these deficiencies are instances in which two patients wore soiled clothing, an incontinent patient wet herself and went unnoticed until the surveyor brought it to the attention of staff members, a patient had reddened buttocks and dried feces on her back, a patient had flies crawling on her face and arms, patients wandered around without being redirected, and a patient pulled the hair out of another patient's head." *Id.* We concluded that based on these and other deficiencies which were not corrected, even if B & T had appealed ISDH's September 2, 1999, notice, New Horizon would not have prevailed. *Id.* at 643–44. We therefore affirmed the trial court's grant of summary judgment in favor B & T on New Horizon's legal malpractice claim. *Id.* at 645.

or 120 days if under appeal, whichever occurs last, with continued payments based on the condition that reasonable efforts were being made to transfer the residents to other facilities pursuant to 42 C.F.R. §§ 441.11 [6] and 442.40(d)(2)(ii).

In September 1999, New Horizon filed a petition for review and petition for stay of FSSA's termination order.

FSSA's last Medicaid payment to New Horizon was on January 29, 2000. At this time, there were approximately 131 residents at New Horizon, all of whom relied on Medicaid. FSSA did not relocate or transfer any of the residents. New Horizon did not either; instead, it unsuccessfully sought recertification. Nearly all residents remained in the facility until the last day of operation under New Horizon's control, which was November 6, 2000. New Horizon provided care and services to these residents during these 281 days without any funding from FSSA. It is undisputed that abandonment of the residents was not an option for New Horizon; to do so would have put them in immediate danger. According to Bradburn, "On more than one occasion we were reminded [by ISDH employees] that we [could not] abandon the residents and if we did we would be charged and convicted of criminal neglect [of a dependent]." Appellant's App. p. 91 (affidavit).

FSSA moved for summary judgment on New Horizon's petition for judicial review in May 2000. An administrative law judge granted summary judgment in favor of FSSA in August. The ALJ concluded that because New Horizon did not file an ad-ministrative appeal of ISDH's determination, FSSA could not maintain a provider agreement with a provider which ISDH had found to be out of compliance with certification requirements. The ultimate authority of FSSA affirmed the ALJ in December. In January 2001, New Horizon sought judicial review of the final agency decision.

Meanwhile, New Horizon continued to operate the facility without Medicaid certification until ISDH filed an action for the appointment of a health care receiver, which the trial court granted in November 2000. Receiver Theresa Haynes took control of the facility on November 7, 2000. She was employed by Fourth Street Solutions and was not an employee of the State. The last New Horizon resident was finally transferred on December 17, 2001, at which point the facility closed. *Id.* at 140 (Bradburn affidavit). Haynes was in control of New Horizon for approximately 405 days. Although FSSA believed that New Horizon was required to pay the costs of the receivership, the receivership court directed FSSA to pay.

In 2002, New Horizon filed for Chapter 7 bankruptcy, and trustee Randall Woodruff was substituted for New Horizon as the real party in interest.[7] *Ind. Family & Soc. Servs. Admin. v. Woodruff,* No. 29A02–0410–CV–876, slip op. at 4, 831 N.E.2d 1264 (Ind.Ct.App. July 14, 2005). In 2004, the trial court reversed the final agency action, and FSSA appealed. On appeal, this Court reversed the trial court and dismissed the action. *Id.* at 7–8. At

---

**6.** 42 C.F.R. § 441.11 actually provides that Federal Financial Participation may be continued for up to thirty days after the effective date of termination of the provider agreement if, among other things, *"[t]he State agency* is making reasonable efforts to transfer those recipients to other facilities or to alternate care." (Emphasis added). Thus, the facility does not have to make reasonable efforts to transfer.

**7.** Even though Woodruff was substituted as the real party in interest, we continue to refer to New Horizon.

the conclusion of this opinion, we instructed:

> In addition, we note that the actual issue before the trial court has become moot, inasmuch as New Horizon filed for bankruptcy under Chapter 7, also known as liquidation bankruptcy. Because New Horizon has been liquidated, it can no longer be a certified Medicaid Provider. This is not to say that the bankruptcy Trustee may not be entitled to recovery for Medicaid services that New Horizon provided during the appeal process. But the Trustee will have to bring a separate contract or quantum meruit action for that recovery.

*Id.* at 8.

On January 27, 2006, New Horizon filed a complaint against FSSA, which it amended on April 24, 2006. The complaint alleges two counts: (1) breach of contract and (2) quantum meruit. The breach of contract count alleges that FSSA breached its Medicaid provider agreement by not paying for the care of four New Horizon residents before New Horizon became decertified and FSSA cut off Medicaid funding. The quantum meruit count alleges that FSSA was unjustly enriched because New Horizon paid $3,963,073.51 for the care of the approximately 131 New Horizon residents from late January 2000 until early November 2000, when the receiver took over. FSSA brought a counterclaim for set-off because it paid the costs of the receivership—over $5.5 million—even though the receivership statute at the time, Indiana Code section 16–28–8–7, provided that the facility must pay the costs when the receiver is not a state employee.

New Horizon moved for summary judgment. FSSA then moved for partial judgment on the pleadings on New Horizon's quantum meruit claim. After a hearing, the trial court entered findings of fact and conclusions of law in April 2008. As for quantum meruit, the trial court granted FSSA's motion for judgment on the pleadings and denied New Horizon's motion for summary judgment. The trial court determined that New Horizon failed to exhaust its administrative remedies by not appealing ISDH's decertification of the facility and, in any case, that New Horizon was responsible for transferring the residents, not FSSA. With respect to breach of contract, the court granted New Horizon's motion for summary judgment for two of the residents and denied summary judgment for the other two residents. These rulings are not at issue on appeal. After a trial on the remaining breach of contract issues, the trial court issued a second order in January 2010 awarding New Horizon $93,666.09 on its breach-of-contract claims. However, the court allowed FSSA to "recover an equal amount on its counterclaim against [New Horizon] as a set-off" for the costs of the receivership. Appellant's App. p. 40. The effect of the trial court's ruling was that neither party owed the other any money.

New Horizon appealed, and we held oral argument in this case on March 10, 2011. As support for its position that FSSA was responsible for transferring the New Horizon residents once its provider agreement was terminated, New Horizon directed us to the State Operations Manual, which is prepared by the federal Centers for Medicare and Medicaid Services. Because New Horizon did not cite to the State Operations Manual in its briefs, we gave New Horizon five days to submit the relevant manual provisions in a notice of additional authority. We also gave FSSA five days to respond to New Horizon's submission. New Horizon filed its Notice of Submission of Additional Authority on March 15, 2011. FSSA filed its Response to Legacy's Submission of Excerpts from the State Operations Manual on March 17, 2011.

### Discussion and Decision

New Horizon raises three issues on appeal. First, New Horizon contends that the trial court erred in granting FSSA's motion for judgment on the pleadings on its quantum meruit claim because New Horizon failed to exhaust its administrative remedies. Second, New Horizon contends that the trial court erred in denying its motion for summary judgment on its quantum meruit claim. Finally, New Horizon contends that the trial court erred in granting FSSA's counterclaim for set-off.

### I. Failure to Exhaust Administrative Remedies

New Horizon contends that the trial court erred in granting FSSA's motion for judgment on the pleadings on its quantum meruit claim because it failed to exhaust its administrative remedies. A motion for judgment on the pleadings attacks the legal sufficiency of the pleadings. *Whitehurst v. Attorneys of Aboite, LLC,* 925 N.E.2d 379, 386 (Ind.Ct.App.2010), *reh'g denied.* Indiana Trial Rule 12(C) provides:

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

In its brief, FSSA asserts that its motion for partial judgment on the pleadings contained an affidavit and therefore this motion should be treated as one for summary judgment under Trial Rule 56. New Horizon does not dispute FSSA's assertion in its reply brief. We therefore rephrase the issue as whether the trial court erred in granting summary judgment in favor of FSSA on New Horizon's quantum meruit claim because New Horizon failed to exhaust its administrative remedies.

When reviewing a grant of summary judgment, our standard of review is the same as that of the trial court. *Dreaded, Inc. v. St. Paul Guardian Ins. Co.,* 904 N.E.2d 1267, 1269 (Ind.2009). Considering only those facts that the parties designated to the trial court, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C); *Dreaded,* 904 N.E.2d at 1269–70. In answering these questions, the reviewing court construes all factual inferences in the nonmoving party's favor and resolves all doubts as to the existence of a material issue against the moving party. *Dreaded,* 904 N.E.2d at 1270. The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Id.* Once the movant satisfies the burden, the burden shifts to the nonmoving party to designate and produce evidence showing the existence of a genuine issue of material fact. *Id.*

The trial court concluded that New Horizon failed to exhaust its administrative remedies because it "failed to timely appeal the [September 1999] survey findings that were the basis for the decertification action." Appellant's App. p. 24 (Conclusions 4 & 6). FSSA points out that although it is true that New Horizon's failure to appeal the survey findings "created a domino effect" that culminated in its exclusion from the Medicaid program, the trial court actually referred to the "wrong agency action" in its findings and conclusions. Appellee's Br. p. 10. Instead, FSSA argues that "the agency action that is relevant to [New Horizon's] quantum

meruit claim is FSSA's denial of the [billing] statements [New Horizon] [continued to] submit[ ] after the decertification of [New Horizon]." *Id.* at 11. FSSA therefore asks us to affirm the trial court on any theory or basis in the record.

FSSA highlights that after New Horizon was decertified and FSSA terminated its provider agreement and cut off Medicaid payments, New Horizon continued to bill FSSA for the residents in its care using the normal Medicaid provider billing process. Accordingly, FSSA's argument continues, New Horizon should have filed an administrative appeal of FSSA's refusal to pay these bills (even though New Horizon was no longer Medicaid-certified). By failing to do so, New Horizon failed to exhaust its administrative remedies.

■ It has long been the law in Indiana that a claimant with an available administrative remedy must pursue that remedy before being allowed access to the judicial power. *Advantage Home Health Care, Inc. v. Ind. State Dep't of Health,* 829 N.E.2d 499, 503 (Ind.2005). FSSA says that it has an administrative appeals process that New Horizon should have used, that is, 405 Indiana Administrative Code 1–1.5–1, which provides that this rule "governs the procedures for appeals to the office of Medicaid policy and planning (office) involving actions or determinations of reimbursement for *all Medicaid providers.*" (Emphasis added). New Horizon responds that because it was no longer a Medicaid provider when it footed the bill for the New Horizon residents after FSSA cut off Medicaid funding, this administrative appeals process was not available to it. Because it had no administrative remedy to exhaust, it properly filed this complaint in the trial court seeking damages pursuant to quantum meruit.

■ We agree with New Horizon. Because New Horizon was no longer a Med-

icaid provider, it was not required to use the administrative appeals process set forth in 405 Indiana Administrative Code 1–1.5–1 for Medicaid providers. Because New Horizon continued to bill FSSA by using the process for Medicaid providers after FSSA cut off Medicaid funding does not require New Horizon to use FSSA's administrative appeals system for challenging the denial of these payments. It seems reasonable that New Horizon would request payment using forms and processes that were familiar and easily understandable to FSSA. The use of such forms, however, did not magically transform New Horizon into a Medicaid provider. Nonetheless, FSSA argues that because it was the entity responsible for transferring the Medicaid patients to a new facility, New Horizon should have administratively appealed its denial of payments. But this argument still does not change the fact that New Horizon was not a Medicaid provider at the relevant time. Because New Horizon did not fail to exhaust its administrative remedies, the trial court erred in granting summary judgment in favor of FSSA on New Horizon's quantum meruit claim on this basis.

## II. Merits of Quantum Meruit Claim

Because we have concluded that the trial court erred in granting summary judgment in favor of FSSA on New Horizon's quantum meruit claim on grounds of failure to exhaust administrative remedies, we now address whether the trial court erred in denying New Horizon's motion for summary judgment on its quantum meruit claim. New Horizon argues that it is entitled to restitution in the amount of $3,963,073.51 because "FSSA has been unjustly enriched by accepting New Horizon's provision of care for Medicaid dependent residents from January 29, 2000 to November 6, 2000 without reimbursing or

otherwise compensating [New Horizon], where [New Horizon] reasonably expected to receive reimbursement." Appellant's Br. p. 15–16.

In the absence of a contract, a party may recover under the equitable theory of quantum meruit, pursuant to which the party may be permitted to recover the reasonable value of services rendered just as if there had been a true contract. *Mueller v. Karns*, 873 N.E.2d 652, 659 (Ind.Ct.App.2007), *reh'g denied*; *see also Zoeller v. E. Chi. Second Century, Inc.*, 904 N.E.2d 213, 220–21 (Ind.2009) ("Express and implied-in-fact contracts are traditional contracts, while constructive contracts, also referred to as quantum meruit, contract implied-in-law, [unjust enrichment], or quasi-contracts[,] are not contracts at all." (quotation omitted)), *reh'g denied*. To recover under a quantum meruit theory, the party must establish that (1) a benefit was rendered to the other party at the express or implied request of that party, (2) allowing the other party to retain the benefit without paying for it would be unjust, and (3) the party seeking recovery expected payment for his services. *Mueller*, 873 N.E.2d at 659. The trial court concluded, in pertinent part:

10. There is no genuine issue of fact that New Horizon was non-compliant with the requirements necessary to remain Medicaid certified. The ISDH found this non-compliance and cancelled that certification effective September 1, 1999. This determination was effectively conceded by [New Horizon's] failure to appeal the determination, and that determination has never been set aside. There can be no question that [New Horizon's] own actions (or inaction) precipitated the situation that followed. [New Horizon] has presented no authority that FSSA had the power to remove or transfer any resident against their will. Douglas Bradburn, president of Legacy, certainly understood this given the wealth of experience and knowledge attested to in his affidavits. Mr. Bradburn also must have known that [New Horizon] was "one of a handful of ICF/MRs" in Indiana providing care to severely and profoundly mentally retarded and developmentally disabled individuals and therefore undoubtedly understood the difficulty FSSA would have in transferring New Horizon's residents to another facility. Despite this, and despite the condition imposed by OMPP's September 9, 1999, letter that continued payments to [New Horizon] for 120 days was conditioned upon "reasonable efforts being made to transfer the residents to other facilities", [New Horizon] made no effort to transfer the residents. The Court therefore concludes as a matter of law on the undisputed facts, that [New Horizon]: (1) cannot prove that any benefit that FSSA may have received from New Horizon's residents remaining in the facility was at the express or implied request of FSSA, and (2) cannot prove that it would be unjust to allow FSSA to retain whatever benefits it may have received from New Horizon's residents remaining in [New Horizon's] care without state compensation. [New Horizon] argues that, "principles of equity prohibit unjust enrichment in cases where a party accepts the unrequested benefits another provides despite having the opportunity to decline those benefits.["] The uncontested evidence in this case establishes however that FSSA had little choice since it had no authority to unilaterally force families to transfer the residents to another facility. It certainly did nothing to impede [New Horizon] from proactively addressing the problem it created for itself, but beyond this, could do little else.

Appellant's App. p. 26–27 (citations omitted). The trial court therefore denied New Horizon's motion for summary judgment as to its quantum meruit claim. *Id.* at 28.

We first address which party—New Horizon or FSSA—was responsible for transferring the ICF/MR residents once New Horizon's provider agreement was terminated because, as both parties conceded at oral argument, this is the crux of the entire case. New Horizon argues that contrary to the trial court's finding, FSSA had sole and total control over transferring the ICF/MR residents and that New Horizon was neither able nor authorized to transfer them. Appellant's Br. p. 14. FSSA concedes in its brief that it "certainly had a role to play in achieving optimal placements for the residents especially in light of the conditions at New Horizon that led to its decertification." Appellee's Br. p. 14. FSSA states, however, that the lack of available placements was an obstacle to the transfer of the New Horizon residents and that it was "[New Horizon] and not FSSA that benefited from the slow removal process." *Id.* In light of the provisions in the State Operations Manual that were brought to light at oral argument, FSSA was more liberal in its concession, stating that although it might have been responsible for transferring the residents, it was not responsible for paying for them pending transfer.

■ The State Operations Manual is an extensive document prepared by the Centers for Medicare and Medicaid Services (CMS), a branch of the U.S. Department of Health & Human Services.[8] *See Barnes*

*& Thornburg,* 837 N.E.2d at 629 n. 16. The Social Security Act mandates the establishment of minimum health and safety standards that must be met by providers and suppliers participating in Medicare and Medicaid programs. U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs., Publ'n No. 100–07, *State Operations Manual,* § 1000, *available at* http://www.cms.gov/manuals/downloads/som107c01.pdf. The Secretary of the Department of Health & Human Services "has designated CMS to administer the standards compliance aspects of these programs." *Id.; id.* § 1006 (noting that CMS central headquarters has "been delegated the authority by the Secretary for assuring that health care providers and suppliers participating in the Medicare, Medicaid, and CLIA programs meet applicable Federal requirements"); *see also S.D. ex rel. Dickson v. Hood,* 391 F.3d 581, 586 (5th Cir.2004) (noting that the Secretary has delegated his federal administrative authority to CMS, an agency within DHHS). Although CMS manuals generally are non-legislative agency manuals that are not entitled to judicial deference under *Chevron, Christensen v. Harris Cnty.,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."), in cases involving Medicare or Medicaid, CMS is a highly expert agency and therefore its interpretation is entitled to "a great deal of persuasive weight." *Estate of Landers v. Leavitt,* 545 F.3d 98, 107 (2d Cir.2008).

8. The Health Care Financing Administration (HCFA) changed its name to the Centers for Medicare and Medicaid Services effective June 14, 2001. Press Release, U.S. Dep't of Health & Human Servs., The New Centers for Medicare & Medicaid Services (CMS) (June 14, 2001), http://archive.hhs.gov/news/press/2001pres/20010614a.html. Even though the agency was known as HCFA during the events in this case, we nevertheless refer to the agency by its current name, CMS, in this opinion.

We start with Section 3008.3A [9] of the State Operations Manual, which provides:

There are instances when patients in Medicare and Medicaid long-term care facilities need to be transferred to other facilities. Specific actions, decisions, and events that require the relocation of patients include:

- Voluntary or involuntary termination of provider agreement;

- Expiration or renewal of an ICF/MR provider agreement;

- The provider's inability to provide care and related services because of fire, natural disaster, loss of staff, or another reason beyond its control;

- The provider's voluntary termination of participation in Medicaid and/or Medicare; and

- Closure of a facility.

In the event that such patients need to be relocated or transferred for one of the above reasons, Section 3008.3B instructs:

*The SMA* [State Medicaid Agency, which in Indiana is FSSA] *has the primary responsibility for relocating Medicaid patients and for ensuring their safe and orderly transfer from a facility that no longer participates in Medicaid to a participating facility. This is because the State remains responsible for the care and services provided to Medicaid patients.* The State's transfer policies must:

- Consider the nature and severity of the facility's failure to meet standards;

- Consider the availability of alternative facilities;

- Ensure that the situation is explained to the recipient and the recipient is permitted to exercise an informed choice as to whether he or she wishes to move and, if so, to which available facility.[10]

- Provide that qualified personnel will assess patients' medical and psychological condition and needs, including the necessity to prepare the patient for transfer;

- Provide for adequate and appropriate transportation on the day the patient is moved; and

- Apprise the receiving facility of the patient's condition and needs.

(Emphasis added).

Section 3008.3B of the manual is based on 42 C.F.R. § 488.426(b), which provides, "When the State or CMS terminates a facility's provider agreement, the State arranges for the safe and orderly transfer of all Medicare and Medicaid residents to another facility." Consistent with that obligation, the State Operations Manual instructs the State to develop a long-term care patient relocation plan for the orderly transfer of patients which has a degree of flexibility that will enable it to be used for the relocation of any number of patients. State Operations Manual, § 3008.3C. The

9. We provide citations to the State Operations Manual in its current form. Although during the events in this case these provisions (specifically Sections 3008.3A–C) were located in the HCFA (and not CMS) manual, the versions are identical. *See* Appellant's Notice of Submission of Additional Authority at 7–8, *Woodruff v. Ind. Family & Soc. Servs. Admin.*, No. 29A02–1002–PL–220 (Ind.Ct.App. Mar. 15, 2011). FSSA does not argue otherwise.

10. FSSA argues in its response to New Horizon's notice of additional authority that this specific provision means that it is not responsible for the care and services provided to a Medicaid recipient who wishes to remain at a facility whose provider agreement has been terminated. This provision, however, is only one factor to be considered when FSSA develops a transfer policy and therefore does not negate its clear-cut responsibility for transferring the residents and providing for their care and services.

plan "should be developed as an ongoing, standard operating procedure that can be implemented *quickly and efficiently.*" *Id.* (emphasis added).

█ According to the clear language in 42 C.F.R. § 488.426(b) and Chapter 3 of the State Operations Manual, once a provider agreement is terminated either voluntarily or involuntarily, as in this case, the State Medicaid Agency has the primary responsibility for relocating the Medicaid patients and ensuring their safe and orderly transfer. In its response to New Horizon's notice of additional authority, FSSA does not dispute that it has this responsibility; rather, FSSA disputes that it must pay for the residents during the transfer process. However, it necessarily follows that FSSA would bear the costs of paying for Medicaid-qualified residents during the transfer process when (1) FSSA is primarily responsible for transferring them and (2) FSSA is responsible for the costs of their care both before a provider agreement is terminated and af-

ter their transfer to a new facility. These undisputed facts together with the admittedly non-binding but persuasive declaration in the State Operations Manual that *"the State remains responsible for the care and services provided to Medicaid patients,"* State Operations Manual, § 3008.3B (emphasis added), convinces us that FSSA must bear the costs for the care and services provided to these patients. Between the government and a private entity, the government is responsible for providing for them, our most vulnerable citizens.

Here, it is uncontested that once New Horizon's provider agreement was involuntarily terminated, FSSA neither accepted primary responsibility for relocating the residents nor paid for their care. Rather, New Horizon provided for that care at a cost of nearly $4 million without any financial assistance from FSSA from January 30, 2000, to November 6, 2000, when New Horizon was forced into a receivership.[11]

---

11. FSSA argued in its brief, though not at oral argument, that the "explicit provisions" of a certain ISDH regulation permit "health facilities" to transfer or discharge residents and New Horizon should have relied on this regulation to transfer its residents. Appellee's Br. p. 14. New Horizon does not dispute that there is a regulation that allows for the transfer or discharge of residents—in limited circumstances—but claims that this regulation does not apply to ICF/MRs. This regulation provides, in pertinent part:

> (4) Health facilities *must* permit each resident to *remain* in the facility and *not transfer or discharge* the resident from the facility *unless:*
>
>     *      *      *      *      *      *
>
> (C) the safety of individuals in the facility is endangered;
> (D) the health of individuals in the facility would otherwise be endangered;
> (E) the resident has failed, after reasonable and appropriate notice, to pay for (or to have paid under Medicare or Medicaid) a stay at the facility. . . .

410 Ind. Admin. Code 16.2–3.1–12 (emphases added).

We first note that 410 Indiana Administrative Code 16.2–3.1–12 is located within Rule 3.1. Rule 3.1 applies to all "comprehensive care facilities." 410 Ind. Admin. Code 16.2–3.1–1. "Comprehensive care facility" is defined as "a health facility that provides nursing care, room, food, laundry, administration of medications, special diets, and treatments and that may provide rehabilitative and restorative therapies under the order of an attending physician." 410 Ind. Admin. Code 16.2–1.1–14. "Intermediate care facility for the mentally retarded (or persons with related conditions)" has its own definition. *See* 410 Ind. Admin. Code 16.2–1.1–33; *supra* note 2. Because comprehensive care facilities and ICF/MRs are separately defined and Rule 3.1 applies only to comprehensive care facilities, it appears that the transfer/discharge rule that FSSA relies on does not apply in this instance.

In any event, even if this provision allowed New Horizon to transfer the residents in limited circumstances, it does not negate the fact

Given this framework, we now turn to the elements of quantum meruit.

### A. Whether Benefit Rendered to FSSA at FSSA's Express or Implied Request

■ New Horizon argues that "FSSA benefited by not paying any provider, let alone [New Horizon], for care of hundreds of Medicaid dependent residents from January 29, 2000 to November 6, 2000" and that "FSSA clearly accepted [New Horizon's] services, as it knew that residents remained in New Horizon and necessitated care and that only FSSA, as the placement authority for residents, could change the circumstances." Appellant's Br. p. 17, 18. In its brief, FSSA counters that this theory is wrong because if a person is eligible for Medicaid and is placed at a facility that has a Medicaid provider agreement, FSSA will reimburse the facility for the care of the Medicaid recipients; however, if the facility becomes decertified, "FSSA can not legally reimburse the facility for the care of its Medicaid recipients." Appellee's Br. p. 18. FSSA's argument, however, ignores its responsibility to transfer Medicaid-eligible patients once a facility's provider agreement has been terminated and to care for these patients during the transfer process.

Here, the evidence shows that despite FSSA's clear-cut responsibilities, FSSA did not transfer the residents once New Horizon's provider agreement was terminated. Instead, the residents remained at New Horizon for approximately nine months, with New Horizon—not FSSA—paying for their care and services. Although there is evidence that FSSA took some initial steps to transfer the Medicaid patients from New Horizon once New Horizon's provider agreement was terminated, the bottom line is that FSSA left them

at New Horizon and let New Horizon pay for them until New Horizon ran out of money, thereby necessitating the appointment of a receiver. Despite FSSA's argument that New Horizon interfered with its efforts to relocate the Medicaid patients and therefore it did the best that it could to fulfill its duty, the trial court found that New Horizon "was in contact with residents' families during the period in question and did not promote or encourage any voluntary relocation of the residents from New Horizon to other facilities." Appellant's App. p. 20. The trial court did not find that New Horizon interfered with FSSA's minimal transfer efforts. Moreover, we note that the trial court's findings and conclusions start with the erroneous premise that New Horizon was responsible for transferring the residents, which, as FSSA concedes in its response to New Horizon's submission of additional authority, *see* Appellee's Response to Legacy's Submission of Excerpts from the State Operations Manual at 3, *Woodruff v. Ind. Family & Soc. Servs. Admin.*, No. 29A02–1002–PL–220 (Ind.Ct.App. Mar. 17, 2011) ("The State's role is to relocate the recipients."), is simply not the case. There is no genuine issue of material fact that there was a benefit rendered to FSSA at FSSA's implied request.

### B. Whether Allowing FSSA to Retain the Benefit Without Paying for It Would Be Unjust

New Horizon argues that FSSA has been unjustly enriched "by not reimbursing [New Horizon] for its services" and "should hereby be disgorged of that measurable gain by an order to pay restitution to [New Horizon]. FSSA was obviously enriched at the expense of [New Horizon]." Appellant's Br. p. 17. FSSA again

that FSSA bore primary responsibility for transferring the Medicaid patients out of New Horizon once New Horizon's provider agreement was terminated.

points out in its brief that it generally does not have an obligation for the care and treatment of Medicaid recipients because any such obligation is contingent upon the provider being certified. FSSA asserts that apart from Medicaid and program services provided by BDDS, it had no obligation for the care and treatment of the New Horizon residents. As a result, when New Horizon became decertified and its provider agreement was terminated, it "became unmoored from the only source of state funding that would reimburse it for the care of its residents." Appellee's Br. p. 22.

■ Again, FSSA's argument does not factor in its responsibility to these patients. Although it is true that New Horizon's own actions or inactions led to the termination of its provider agreement, once the provider agreement was involuntarily terminated, FSSA's responsibility to transfer and care for these Medicaid patients was triggered. The reason for the termination of the provider agreement no longer mattered. And FSSA had no contingency plan to fulfill its transfer responsibility in a timely manner.

At first blush, it may sound attractive to force New Horizon to pay nearly $4 million for the care of these patients because, after all, it was New Horizon that allowed the care of these patients to deteriorate to the point that FSSA was forced to terminate New Horizon's provider agreement. However, FSSA's responsibility to transfer the patients is triggered whether the provider agreement is terminated either voluntarily or involuntarily, which presumes that the facility did something wrong. *See* 42 C.F.R. § 488.426(b) ("When *the State* ... *terminates* a facility's provider agreement, the State arranges for the safe and orderly transfer...." ) (emphasis added); State Operations Manual, § 3008.3A ("There are instances when patients in ...

Medicaid long-term care facilities need to be transferred to other facilities. Specific actions ... that require the relocation of patients include: Voluntary or *involuntary* termination of provider agreement.") (emphasis added). Therefore, the reason for the termination becomes immaterial once FSSA terminates a facility's provider agreement.

Because FSSA was responsible for the care and services provided to the Medicaid patients pending their transfer, allowing FSSA to retain the benefit of approximately nine months of care provided to these patients without paying for it would be unjust. There is no genuine issue of material fact on this element.

### C. Whether New Horizon Expected Payment for Its Services

New Horizon argues that it reasonably expected payment from FSSA and FSSA could reasonably believe that New Horizon expected payment. FSSA responds that New Horizon, a for-profit company, was involved in a highly-regulated industry and knew that a day might come when it would lose certification, have its provider agreement terminated, and have to turn to other sources for funding.

■ FSSA's argument again fails to account for its responsibility to transfer these Medicaid patients once a facility's provider agreement is involuntarily terminated and provide for their care and services. As New Horizon convincingly states in its brief, "FSSA was able to continue to receive services but avoid payments it would otherwise be required to make. [New Horizon] did not anticipate that it would continue to care for its residents for several months at its own expense.... [New Horizon] was providing a service to the State for the State's patients." Appellant's Br. p. 23. And during this time period, New Horizon showed its

expectation of payment by continuing to submit claims to FSSA. There is no genuine issue of material fact that New Horizon expected payment for its services.

Because there is no genuine issue of material fact that (1) a benefit was rendered to FSSA at the implied request of FSSA, (2) allowing FSSA to retain the benefit without paying for it would be unjust, and (3) New Horizon expected payment for its services, we conclude that the trial court erred by denying New Horizon's motion for summary judgment. We therefore direct that summary judgment be entered in favor of New Horizon on its quantum meruit claim. And because there is no dispute as to the amount of damages New Horizon is entitled to for providing care and services to the Medicaid patients for those 281 days, judgment should be entered in the amount of $3,963,073.51 on New Horizon's quantum meruit claim.

### III. Receivership Costs

Finally, New Horizon contends that the trial court erred in allowing FSSA to set off the amount it owed New Horizon for breach of contract—$93,666.09—against the amount that FSSA incurred in operating the receivership—over $5.5 million. This issue requires us to examine the previous and current versions of the receivership statute. New Horizon argues that the version of the receivership statute in effect at the time of this case should control. FSSA, however, argues that a 2002 amendment to the receivership statute, which defined for the first time receivership costs, applies because the amendment was meant to clarify what was recoverable under the previous version of the statute and not to change the law.

During the New Horizon receivership, the receivership statute provided that "[t]he costs of placing a receiver in a health facility excluding the cost of the receiver's bond, shall be paid by: (1) the

health facility, if the receiver is not a state employee; or (2) the state, if the receiver is a state employee." Ind.Code Ann. § 16–28–8–7 (West Supp.2001). The statute did not define "the costs of placing a receiver."

In 2002, after the New Horizon receivership ended, the Indiana General Assembly amended the receivership statute to define receivership costs. Indiana Code section 16–28–8–7 now provides:

(a) The costs of the receivership shall be determined by the court and shall be paid by the owner or operator of the health facility.

(b) If the receiver is a state employee, the state shall pay the receiver's salary.

(c) Any cost of receivership paid by the state for the receivership of a health facility is a preferred claim against the receivership estate. The state may file a claim against the health facility or the health facility's assets and resources for recovery of any administrative expense incurred by the state under this chapter.

(d) Any asset or resource of the health facility may be used to:

(1) fund the cost of receivership; and

(2) reimburse any expenditure made by the state under this chapter.

P.L. 29–2002, Sec. 3; Ind.Code Ann. § 16–28–8–7 (West 2007). In addition, Indiana Code section 16–28–8–0.5 was added to define the "cost of receivership" as "the costs of placing a receiver in a health facility *and* all reasonable expenditures and attorney's fees incurred by the receiver to operate the health facility while the health facility is in receivership." P.L. 29–2002, Sec. 2; Ind.Code Ann. § 16–28–8–0.5 (West 2007) (emphasis added). New Horizon argues in its brief that under the version of the statute in effect at the time of this case, it was responsible for paying only the cost of placing the receiver in

New Horizon and not all the operational costs, which the amended statute allows.

An amendment to a statute raises the presumption that the legislature intended to change the law, unless it clearly appears that the amendment was passed in order to express the original intent more clearly. *United Nat'l Ins. Co. v. DePrizio,* 705 N.E.2d 455, 460 (Ind.1999). That is, where it appears that the legislature amends a statute to express its original intention more clearly, the normal presumption that an amendment changes a statute's meaning does not apply. *Ind. Dep't of Rev. v. Kitchin Hospitality, LLC,* 907 N.E.2d 997, 1002 (Ind.2009). Here, the trial court found that the amendment was not meant to expand what the State could recover but rather was "a clarification of what the State was already empowered to do." Appellant's App. p. 39 (Conclusion 14). We agree.

Because the previous version of the statute did not contain any definitions or explanations as to what receivership costs meant, we find that the legislature was merely clarifying its original intent and not changing the law when it amended the receivership statute in 2002 to add a definition for "cost of receivership."

Nevertheless, the receivership statute does not apply in this case because FSSA was the entity that was responsible for transferring the Medicaid patients at New Horizon and providing for their care and services. It would be an absurd result to find that FSSA was responsible for paying for the residents during the transfer process but that once the receiver had to step in (because New Horizon ran out of money because it paid when FSSA should have), New Horizon suddenly became responsible for the costs of the receivership. FSSA's concession on this point was clear at oral argument: if FSSA was responsible for transferring and paying for the resi-

dents, then the receivership statute would not require New Horizon to pay for any of the costs of the receivership. Because New Horizon has no liability for the receivership costs, FSSA is not entitled to set off any of the judgments entered against it—neither the $3,963,073.51 quantum meruit judgment nor the $93,666.09 breach of contract judgment—against the over $5.5 million it incurred in operating the receivership.

Reversed and remanded.

BAKER, J., and BARNES, J., concur.